**Paul A. MAVIS**
**Plaintiff,**

v.

**COMMERCIAL CARRIERS, INC., a corporation, Defendant.**

**COMMERCIAL CARRIERS, INC., a corporation, Counterclaimant,**

v.

**Paul A. MAVIS et al.,**
**Counterdefendants.**

**No. CV 74–2708–AAH.**

United States District Court,
C. D. California.

Nov. 21, 1975.

---

Walter H. Young and Young & Young, Los Angeles, Cal., for plaintiff.

James L. Hunt, Lynn H. Pasahow and McCutchen, Doyle Brown & Enersen, and Martin J. Rosen and Silver, Rosen, Fischer & Stecher, San Francisco, Cal., for defendant, Commercial Carriers, Inc.

## FINDINGS, CONCLUSIONS AND ORDER DENYING PLAINTIFF'S REQUEST FOR DISQUALIFICATION OF TRIAL JUDGE

HAUK, District Judge.

This matter came on for hearing Monday, November 17, 1975, at 1:30 p. m., before the Honorable A. Andrew Hauk, United States District Judge, to whom the case, cause and proceedings herein [1] were heretofore assigned by lot under the rules, regulations and orders of this United States District Court for the Central District of California, and particularly, General Order No. 104 thereof, upon the following papers and pleadings:

1. A letter addressed to said Judge Hauk, dated October 28, 1975, by Walter H. Young, attorney for plaintiff, with copies sent to defendant's counsel and to Chief Judge Stephens of this Court enclosing a copy of "REQUEST TO HON. A. ANDREW HAUK, JUDGE, TO EXCUSE HIMSELF FROM THE TRIAL OF THIS ACTION AND RETURN THE CAUSE FOR REASSIGNMENT." The letter further stated:

"I have not actually scheduled a Motion on this Request as it is my understanding that it is proper to call the facts to the attention of the Court in this matter, rather than in the form of a formal Motion.

If your Honor feels that this Request should be made in the form of a formal Motion, I will schedule the same accordingly."

This letter was received on October 28, 1975, and at that time the Court made its Order to the Clerk to file the letter and its enclosure and put it on the calendar as a "motion" under the Court's "17-day" Rule, Local Rule 3(e). Whereupon the Clerk, by Minute Order of October 30, 1975, set the matter for hearing on November 17, 1975, at 10:00 a. m., when it was continued to 1:30 p. m., because of the crowded motion calendar for that morning. See Appendix A attached.

2. Thereafter plaintiff's counsel filed Points and Authorities in Support of the "Request" for Disqualification, and a Supplemental Declaration of Plaintiff's Counsel, Walter H. Young (Appendix B attached).

3. In reply thereto, defendant filed a Response with Points and Authorities, and Affidavits of R. G. Furse and Edward T. Bowers, Executives of Texas Gas Transmission Corporation, the parent company of a corporation, American Commercial Lines which owns all of the stock of defendant Commercial Carriers, Inc. (Appendix C attached).

After full consideration of each and all of said pleadings and points and authorities therein contained, and the oral arguments made before the Court on Monday, November 17, 1975, and good cause appearing, the Court orally discussed the various contentions and made its oral order refusing to disqualify, recuse or excuse itself from further

---

1. This is a civil contract action and counterclaim concerning an alleged agreement for sale by plaintiff Mavis to defendant Commercial Carriers, Inc., of certain assets of another corporation, Robertson Truck-A-Ways, Inc., a wholly owned subsidiary of Dallas and Mavis Forwarding Company whose stock is wholly owned by plaintiff Mavis. Originally filed in the Superior Court of the State of California in and for the County of Los Angeles, No. C 97574, it was removed to the United States District Court, Central District of California on the grounds of diversity of citizenship of the parties. 28 U.S.C. § 1332.

Numerous pretrial motions, and two amended complaints as well as a counterclaim, utilizing four files in the Clerk's Office, have been before the Court prior to the filing of the Request for disqualification being ruled upon herein.

proceedings in this case, and noted that it would make and enter written Findings, Conclusions and Order, which it now does, as follows:

## FINDINGS AND CONCLUSIONS

(1) *The Letter and Request of Plaintiff's Attorney For Disqualification of the Court Are, and Each of Them Is, Legally Insufficient Under Local Rule 1.8, as well as 28 United States Code 144.*

■ The letter of plaintiff's said counsel, Walter H. Young, with its enclosure was submitted in violation of Local Rule 1.8 of the Central District of California, which provides as follows:

"1.8 Correspondence and Communications with the Judge:

Attorneys or parties to any action or proceeding should refrain from writing letters to the Judge or otherwise communicating with the Judge unless opposing counsel is present. All matters to be called to a Judge's attention should be formally submitted as hereinafter provided."

For this reason it is legally insufficient, but rather than waste time and paper, the Court ordered the Clerk, as stated above, to put it and its enclosure on the motion calendar under Local Rule 3(e) and it was so held on Monday, November 17, 1975. Counsel's failure to abide by Local Rule 1.8 was, therefore, permitted in this instance, and while it is legally insufficient, we are treating the letter as a motion.

However, since 28 U.S.C. § 144 requires that any party seeking to disqualify a Federal Judge must file a "timely and sufficient affidavit" of "the party" (not the attorney) and further that the affidavit of the *party* (not the attorney) must be accompanied by a certificate of counsel of record stating that it is made in good faith, it is clear beyond any doubt that the letter and request (or declaration, or affidavit whichever it may be) are both legally insufficient to meet the requirements of 28 U.S.C. § 144.[2] The same legal insufficiency is found in the Supplemental Declaration of Attorney Walter H. Young. (Appendix B) All three are signed by the attorney (Walter H. Young) for the party and *not* by the party, and the affidavit, if it be such, as well as the supplemental declaration were not accompanied by a certificate of counsel of record stating that they were made in good faith. See Appendices A and B.

The Court is obliged to determine their legal sufficiency under 28 U.S.C. § 144. *Berger v. United States*, 255 U.S. 22, 33, 41 S.Ct. 203, 65 L.Ed. 481 (1921); *Botts v. United States*, 413 F.2d 41 (9th Cir. 1963); *United States v. Tropiano*, 418 F.2d 1069 (2d Cir. 1969); *Lyons v. United States*, 325 F.2d 370 (9th Cir. 1963), *cert. den.*, 377 U.S. 969, 84 S.Ct. 1650, 12 L.Ed.2d 738 (1964). Since they are not legally sufficient, being signed and filed solely and only by the attorney, Walter H. Young, and not by the party, Paul A. Mavis, they are obviously legally insufficient.

(2) *Assuming the Papers in Appendix A Had Been Signed and*

2. § 144. *Bias or prejudice of judge*

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice

exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith. June 25, 1948, c. 646, 62 Stat. 898; May 24, 1949, c. 139, § 65, 63 Stat. 99.

*Filed By The Party, Paul A. Mavis, They Are Still Legally Insufficient Under 28 United States Code 144 and 28 United States Code 455.*

■ While we believe that the points already made would be sufficient in and of themselves to require this Court to deny a request by plaintiff's counsel that the Court disqualify itself in this case, we will, for the purpose of the following discussion, assume that the "Request" (Appendix A) is the affidavit of the party, and further that the failure to accompany it with a certificate of good faith by counsel of record for the party is not fatal. Nevertheless, even assuming these to be the facts, which they obviously are not, it is just as certain that neither the letter, nor the request (see Appendix A) nor the Supplemental Declaration of the attorney, Walter H. Young, (Appendix B) nor any of them, is or are legally sufficient under 28 U.S.C. § 144 and 28 U.S.C. § 455.

We note that in the "Request" (Appendix A) plaintiff's counsel sets forth two contentions for disqualification of the Court:

(i) That since the Court admittedly owns substantial common stock in Union Oil Company of California, and since defendant Commercial Carriers,

Inc., is wholly owned by American Commercial Lines, which is, in turn, wholly owned by Texas Gas Transmission Corporation, which has engaged in joint ventures in offshore oil and gas exploration in the Gulf of Mexico with Union Oil Company of California, and has purchased gas from said Union Oil Company of California, the Judge has some sort of interest in defendant Commercial Carriers, Inc., which would serve to disqualify him under 28 U.S.C. § 455.

(ii) That certain statements of defendant's counsel made to plaintiff's counsel outside the presence, hearing and knowledge of the Judge, apparently at depositions and in other meetings of counsel out of Court, somehow constitute a circumstance which should disqualify the Judge under 28 U.S.C. § 455.

Let us analyze these two contentions by taking the second one up first.

It is absolutely clear from all of the papers filed, as listed hereinabove and set forth in Appendices A, B and C, that the Court was not present, did not hear and had absolutely no knowledge whatsoever of any statements made out of court by any counsel to any other counsel. It is perfectly plain that any such statements could not constitute grounds for disqualification of the Judge under 28 U.S.C. § 455.[3]

---

3. § *455. Disqualification of justice, judge, magistrate, or referee in bankruptcy*

(a) Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

Turning now to the first contention of plaintiff's counsel, namely, that the Judge should have disqualified himself, because he owns stock in Union Oil Company of California which has engaged in joint ventures with and sold gas to Texas Gas Transmission Corporation, which wholly owns American Commercial Lines which, in turn, wholly owns defendant Commercial Carriers, Inc. Somehow, what plaintiff's counsel seems to say is that because the Judge owns stock in Union Oil Company, he cannot preside over, but must disqualify himself from, any and all proceedings which may involve a subsidiary, twice removed, of a corporation which has done business with Union. To state the contention is to refute it as legally insufficient on any sound or reasonable basis.

■ But let us be more specific and analyze each subsection of 28 U.S.C. § 455, assuming, once again, contrary to the facts, that a proper affidavit and certificate of probable cause were filed in this matter. With that assumption,

there is no doubt that it is the duty of the Judge sitting in the case to make the decision as to whether or not the affidavits are sufficient. In doing so, the Judge cannot pass upon or dispute the truth of the factual allegations set forth in the affidavits. *Berger*, 255 U. S. 22, 33, 41 S.Ct. 230, 65 L.Ed. 481 (1921); *Botts*, 413 F.2d 41 (9th Cir. 1963); *Tropiano*, 418 F.2d 1069 (2d Cir. 1969); *Lyons*, 325 F.2d 370 (9th Cir. 1963), cert. den., 377 U.S. 969, 84 S.Ct. 1650, 12 L.Ed.2d 738 (1964), *supra*.

For the record, we feel constrained to affirm that the Judge does not now have nor did he ever have any personal bias or prejudice in the slightest degree for or against any of the parties to this case, cause and proceeding herein, and more particularly, does not have now, nor did he ever have any such personal bias or prejudice in the slightest degree against the plaintiff, Paul A. Mavis.

The question we must turn to then, is whether or not the allegations set forth in the Request and Supplemental Declaration (assuming for the moment

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

(c) A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

(d) For the purposes of this section the following words or phrases shall have the meaning indicated:

(1) "proceeding" includes pretrial, trial, appellate review, or other stages of litigation;

(2) the degree of relationship is calculated according to the civil law system;

(3) "fiduciary" includes such relationships as executor, administrator, trustee, and guardian;

(4) "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

(i) Ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless

the judge participates in the management of the fund;

(ii) An office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

(iii) The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

(iv) Ownership of government securities is a "financial interest" in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

(e) No justice, judge, magistrate, or referee in bankruptcy shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

As amended Dec. 5, 1974, Pub.L. 93–512, § 1, 88 Stat. 1609.

1 U.S.Code Cong. and Admin.News, 93rd Cong.2d Ses.1974, pp. 1852–1854.

that they are appropriate affidavits of a *party,* and that the appropriate certificate by counsel of good faith has been filed as required by 28 U.S.C. § 144, which allegations the Court must accept as true, and in the absence of any contradictory evidence which as has been noted is absolutely impermissible under 28 U.S.C. § 144), are legally sufficient to show any one of the disqualifying grounds set forth in the new Federal statute on disqualification of Judges, 28 U.S.C. § 455, and in the new "Code of Judicial Conduct for United States Judges" which was promulgated and enacted by the United States Judicial Conference at its semi-annual session, March 7 and 8, 1974, and amended at its March 6 and 7, 1975 session.

Now today, 28 U.S.C. § 455 and the Code of Judicial Ethics, Canon 3 C are virtually identical, with only one difference, and that is that the Judicial Conference has ruled in eliminating former Canon 3 D that there cannot be a waiver of any of the grounds for disqualification, whereas 28 U.S.C. § 455(e) provides that waiver can be accepted as to the ground for disqualification, under subsection (a).

Let us take up the first ground for disqualification in 28 U.S.C. § 455(a). It provides that:

"Any . . . judge . . . of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

Canon 3 C (1) states the same ground, but then adds additional grounds which are set forth in subsections (b) and (c) of 28 U.S.C. § 455.

■ Thus it is incumbent upon us first to determine whether this is a proceeding in which the Judge's impartiality might reasonably be questioned. Disqualification or recusal certainly is not automatically required merely upon the filing of the letter request, declarations or affidavits. If there were support for this line of reasoning, the floodgates would be opened to "judge-shopping" and the impressive body of precedents which we have heretofore cited in *Berger* and its progeny would be wiped out.

■ In any event, while the new and revised statute on judicial disqualification, 28 U.S.C. § 455, broadens the grounds for recusal or disqualification and is intended to eliminate the "duty to sit" concept of the old statute, it has not changed the law to the extent plaintiff's counsel attempts to suggest. The standard of the general disqualification provision, Section 455(a) of 28 U.S.C., is still one of reasonableness and should not be interpreted to include a spurious or loosely based charge of partiality.

The legislative history of the new Section 455 makes this abundantly clear in House Report No. 93–1453, adopting Senate Report No. 93–419, 3 U.S.Cong. & Admin.News, 93rd Cong., 2d Ses. 1974, pp. 6351–6363. In particular, this Report concludes at Page 6355:

"While the proposed legislation would remove the 'duty to sit' concept of present law, a cautionary note is in order. No judge, of course, has a duty to sit where his impartiality might be reasonably questioned. However, the new test should not be used by judges to avoid sitting on difficult or controversial cases.

At the same time, in assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a reasonable basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a 'reasonable fear' that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question

of impartiality, but they are not entitled to judges of their own choice.

Finally, while the proposed legislation would adopt an objective test, it is not designed to alter the standard of appellate review on disqualification issues. The issue of disqualification is a sensitive question of assessing all the facts and circumstances in order to determine whether the failure to disqualify was an abuse of sound judicial discretion."

Having these thoughts in mind, we have approached each and all of the allegations of plaintiff's counsel sensitively and utilizing sound judicial discretion, having in mind at all times that judge shopping is "out." We have measured the allegations by all of the grounds set forth in the new 28 U.S.C. § 455(a) and Code of Judicial Conduct, Canon 3 C and find that the allegations are not legally sufficient.

First of all, there are no allegations of fact showing that the Court's impartiality might reasonably be questioned. If the contentions of the plaintiff's attorney are given any credence in this regard it would mean that this Court would be forced to disqualify itself in any case in which a party has had any kind of business transactions with Union Oil Company of California, which would include banks and investment companies, stock transfer agents, lenders, borrowers, service stations, employees and anyone and anybody else who had any kind of business dealings with Union Oil Company. Here, Union Oil Company of California is *not* a party to the proceedings, nor is there any allegation of any kind that the defendant Commercial Carriers, Inc. itself ever had any business dealings of any kind with Union Oil Company of California. There is simply no basis at all on which the Court's impartiality might reasonably be questioned.

Having the same thoughts in mind, and with the same sensitivity that we have disposed of the ground stated in Section 455(a), let us examine the other grounds in Section 455 of 28 United States Code:

"(b) He shall also disqualify himself in the following circumstances:

(1) [Canon 3 C (1)(a)] Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."

—There is absolutely no allegation of any kind stating facts to show this ground.

"(2) [Canon 3 C (1)(b)] Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it."

—There are no allegations concerning this ground whatsoever.

"(3) [Canon 3 C (1)(e)] Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy."

—This is, obviously, not involved.

"(4) [Canon 3 C (1)(c)] He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."

—It is true, as alleged, that the Court holds stock in Union Oil Company of California, but that does not constitute any financial interest in the subject matter in controversy, or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding. This proceeding could not possibly affect the Court's stocks in Union Oil or its value.

"(5) [Canon 3 C (1)(d)] He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding."

—There is no allegation as to this.

"(c) [Canon 3 C (2)] A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household."

—The Court has informed itself and knows that the only stock held in Union Oil Company of California is held by the Judge and his spouse in joint tenancy.

We will not go into the other subsections, (d) [Canon 3 C (3)] which are merely definitions, or (e), which provides for partial waiver which is not permitted under the Code of Judicial Conduct, except to point out that the term "financial interest," which is a ground for disqualification under Section 455(b)(4), is defined as follows in Section 455(d)(4):

" '[F]inancial interest' means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party . . . ."

■ Obviously the business relationships in which Union Oil sells gas to Texas Gas Transmission Corporation, and in which they engage in a joint venture for off-shore oil and gas drilling and exploration in the Gulf of Mexico cannot, and will not be permitted to, transmogrify or pervert a stock ownership in Union Oil into a "financial interest in the subject matter in controversy or in a party [defendant] to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding" 28 U.S.C. § 455(b)(4). Moreover, it is beyond doubt that here the only claim by plaintiff's attorney and the only fact of the matter is that the parent corporation of defendant, once removed, that is Texas Gas Transmission Corporation, the parent of American Commercial Lines, the parent of defendant Commercial Carriers, Inc., has some contracts with Union Oil involving commercial ventures in gas sales, drilling and exploration all of which are completely and entirely unrelated in any way, either to the proceedings herein or to any party, including the defendant herein, or any issue of any kind involved herein. There is no such claim, and there can be no such claim, if we deal in fact and not fantasy or fancy of plaintiff's counsel.

(3) *The Authorities Cited by Plaintiff's Counsel Do Not Demonstrate that Plaintiff's Alleged Grounds for Disqualification are Legally Sufficient.*

Plaintiff's counsel relies entirely on three cases to support his claim of the alleged and imaginary "financial interest" or other interest, precluded by 28 U.S.C. § 455. As we shall now demonstrate, none of these three cases has any applicability whatsoever.

(i) *Adams v. Minor,* 121 Cal. 372, 53 P. 815 (1898)

This was an action involving the question of the validity of certain bonds issued by an irrigation district, a portion of which bonds were held by a bank in which the Superior Court Judge owned stock. The Supreme Court of California naturally held that the Judge should be disqualified as "interested" within the meaning of CCP 170. But

here in our case, there is no showing that the Judge has any interest in any company holding anything belonging to the defendant party.

(ii) *Texaco, Inc. v. Chandler*, 354 F.2d 655 (10th Cir. 1965)

In this case, under the old 28 U.S.C. § 455, the Tenth Circuit properly held that a District Judge should not sit in a case in which the attorney for the plaintiff was a lawyer who represented the Judge in another case, and accordingly, properly granted mandamus to disqualify the Judge. In our case here, the Judge has never had any kind of relations with counsel for plaintiff or counsel for defendant, nor has he ever utilized or employed either set of counsel in any way, shape or form.

(iii) *In Re Honolulu Consolidated Oil Co.*, 243 F. 348 (9th Cir. 1917)

In this case, it appeared that District Court Judge Bledsoe had stock in an oil company that was involved in another case as part of a scheme or plan of unitary litigation brought by the United States in numerous suits against various oil companies concerning oil lands ownership. In this *Honolulu* suit also brought by the United States against Honolulu Consolidated Oil, but in Judge Bledsoe's Court and as part of the same unitary scheme or plan of litigation, Judge Bledsoe refused to disqualify himself, because he did not hold any interest in Honolulu Consolidated. However, it was obvious that any decision he would render in the *Honolulu* case would (because it was part of the same unitary scheme or plan of litigation brought by the United States in numerous cases against various oil companies, including the other case involving the oil company in which Judge Bledsoe *did* hold stock ownership), affect his interest as a shareholder in the company in which he *did* hold stock, even though the case involv-

ing it was not before him. Accordingly the Ninth Circuit properly held that Judge Bledsoe "is sufficiently related to the litigation to impel the conclusion that he is concerned in interest, and therefore should not sit." 243 F. 348, 353. And so a Writ of Mandamus was issued requiring him to disqualify himself.

But here again this case has no possible application to the proceeding herein, since there is no unitary scheme or plan of litigation at all. Here, as far as we know or are informed, there is no Union Oil litigation of any kind related in the slightest degree to the litigation herein. Certainly plaintiff's counsel has made no showing whatsoever of any such scheme or plan of unitary litigation.

## ORDER

Upon the Findings and Conclusions set forth above, and the Court being convinced that the allegations of plaintiff's attorney (Appendices A and B) are not legally sufficient to raise any ground or issue of disqualification or recusal under 28 U.S.C. § 144, 28 U.S.C. § 455, the Code of Judicial Conduct for United States Judges, Canon 3 C, or the long-standing case law of *Berger* and its progeny, and this Judge knowing of the heavy burdens already borne by the other Judges on this Court which would be greatly exacerbated by the reassignment of this proceeding to another Judge of this Court,

It is hereby ordered:

1. That the letter, request and supplemental declaration of plaintiff's counsel that this Judge be disqualified and recuse himself from the case, cause and proceedings herein, be, and the same hereby are, denied.

2. The Clerk is directed to file and enter these Findings, Conclusions and Order forthwith and serve copies thereof upon counsel for all parties herein.

## APPENDIX A

### REQUEST TO HON. A. ANDREW HAUK, JUDGE, TO EXCUSE HIMSELF FROM THE TRIAL OF THIS ACTION AND RETURN THE CAUSE FOR REASSIGNMENT

STATE OF CALIFORNIA }
COUNTY OF LOS ANGELES } ss.

WALTER H. YOUNG does hereby and herewith certify and declare that the following facts are true:

(1) That he is the attorney for the plaintiff.

(2) That declarant calls to the attention of HON. A. ANDREW HAUK certain facts concerning the relationship of COMMERCIAL CARRIERS, INC. to TEXAS GAS TRANSMISSION, and the relationship of TEXAS GAS TRANSMISSION to UNION OIL CORPORATION, with which HON. A. ANDREW HAUK may not be familiar.

(3) That declarant also calls attention of the Judge to certain comments and statements that are constantly being made by defendant's counsel concerning predictions as to how this Judge will rule, and that by virtue of the combination of said events declarant requests this Court to excuse himself from the trial of this action and return the cause to the HON. ALBERT LEE STEPHENS, Senior Judge, for reassignment.

(4) This affidavit is made pursuant to Public Law 93–512, 88 Statutes 1609, amending Section 455, title 28 U.S.Code, approved and in force and effect December 5, 1974. That section applies to any case the trial of which will be after that date, and this case has not yet been tried. That section uses the mandatory word "shall" and requires the Judge to excuse himself from the trial of an action under the circumstances set forth in said section. Declarant relies on Subdivisions (a) and (b) of said section and all portions of said Section 455, as amended, and requests HON. A. ANDREW HAUK to excuse himself in these proceedings and return the case to the Senior Presiding Judge, HON. ALBERT LEE STEPHENS, for reassignment.

(5) There are two major bases for this motion, one being the relationship between HON. A. ANDREW HAUK, JUDGE, and UNION OIL CORPORATION, and the relationship of the UNION OIL CORPORATION to TEXAS GAS TRANSMISSION, which owns COMMERCIAL CARRIERS, INC. as a wholly-owned subsidiary, the defendant in this action; and the second basis is that the declarations and statements of defendant's counsel, predicting what this Judge will do in this action make a combination of circumstances, whereby in the interest of justice and the judicial system, it would be best if this matter were assigned to some other court.

APPENDIX A—Continued

(6) HON. A. ANDREW HAUK did on December 2, 1974, fully and fairly acknowledge publicly that he had a substantial interest in UNION OIL OF CALIFORNIA (hereinafter referred to as "Union"), by voluntarily excusing himself from the trial of Case No. CV 74–2374–AAH, entitled *People of the State of California v. Roger C. B. Morton, Secretary of Interior*, and a certified photostatic copy of minute order in that case is attached.

In addition to JUDGE HAUK'S substantial financial interest in Union, it is a matter of public knowledge by printed information in books and pamphlets relating to judges, that HON. A. ANDREW HAUK, JUDGE was prior to his elevation to the bench, counsel for Union.

(7) However, there is nothing in the record in this case to date that indicates Union's financial connection with Texas Gas Transmission, a publicly-owned corporation, or that COMMERCIAL CARRIERS, INC. is a wholly-owned subsidiary of Texas Gas Transmission, such facts at this point not having been disclosed to the court by anything in the record in this case. The fact that Texas Gas Transmission owns COMMERCIAL CARRIERS, INC. appears as public information in the Standard & Poors Corporation information sheet, issued September 24, 1975.

(8) Furthermore, at depositions taken at the office of Texas Gas Transmission on October 13 and 14, 1975, in Owensboro, Kentucky, of its attorney, E. Phillips Mallone, and the former President of COMMERCIAL CARRIERS, INC., Charles Herrick, and a Richard Young, a Vice President of Texas Gas Transmission, it was admitted and acknowledged that Texas Gas Transmission owns COMMERCIAL CARRIERS, INC. as a wholly-owned subsidiary.

At said depositions, it was established in the course of the depositions that Texas Gas Transmission operates a pipe line, emanating from Louisiana, and that Union is one of its two principal suppliers of gas, which it purchases from Union. Following that deposition in the discussion with E. Phillips Mallone, attorney for Texas Gas Transmission, Mr. Mallone in response to questions from declarant, informed declarant that Texas Gas Transmission purchases a great part of its gas from Union and, furthermore, is engaged in joint partnership exploration and development with Union in Louisiana and Gulf of Mexico area.

Attached hereto are photostatic copies of 1972, '73 and '74 annual reports of Union, which show that Union has a huge natural gas production, that it operates in Louisiana, that it has partners in Louisiana, and that Union Oil's efforts to increase domestic produc-

tion are centered in that area in the Gulf of Mexico. While the Union annual reports do not name any of the partners, Texas Gas Transmission is, in fact, a partner with Union according to the information supplied to declarant by E. Phillips Mallone, attorney for Texas Gas Transmission.

Attached hereto is a letter by declarant to defendant's counsel, requesting them to make a full, fair, complete and honest disclosure of the sales of gas by Union to Texas Gas, and the joint and partnership ventures in which the two companies are engaged in Louisiana and the Gulf of Mexico.

That it is clearly apparent therefore that the real party in interest in this lawsuit is Texas Gas Transmission as the owner of Commercial Carriers, and that there is a direct financial relationship between Union Oil and Texas Gas Transmission by virtue of the large amounts of monies which must pass between the two corporations for the purchase and sale of millions of cubic feet of gas and by virtue of the partnership and joint ventures between said two corporations in the Louisiana and Gulf of Mexico area. The fortunes of Texas Gas Transmission affect the financial position of Union Oil Corporation, in which Hon. A. Andrew Hauk has a substantial interest pursuant to his previous public declaration, and, therefore, it is inappropriate in this action that he should be called upon to rule whether Texas Gas Transmission, through Commercial Carriers, Inc., should be permitted to acquire Mr. Mavis' business and/or recover damages from Mr. Mavis, and/or whether Mr. Mavis should be permitted to keep his business and/or recover damages from Commercial Carriers, Inc., the wholly-owned subsidiary of Texas Gas Transmission.

The second aspect of this situation relates to declarations and statements by defendant's counsel, Mr. Lynn H. Pasahow and Mr. James L. Hunt. That since the commencement of this action, defendant's counsel have on innumerable occasions, in the course of depositions, and before and after hearings before this Court, have stated to declarant in very positive terms that they were certain the Court would rule in their favor on the particular matter at issue and have made predictions that the Court would rule in their favor on other matters, such as,

"If we have to go before the judge, *I am sure* he will rule in our favor."

"I have no objection to your going before the judge on this record—and I have no doubt that we will be awarded sanctions if you do."

"If you inhibit my deposition, I will terminate the deposition and see the judge."

When the defendant's counsel failed to comply with the rules and file a pretrial statement after three prior pretrial continuances and I complained, counsel said,

"We will ask for a continuance—and there is no doubt that Judge Hauk will grant our motion to continue the pretrial."

At that hearing, the Court granted the pretrial and made other rulings. Following that hearing, Mr. James L. Hunt stated to declarant in the hall:

"You have lost every motion before Judge Hauk, and you will continue to do so—and furthermore he will strike your cause of action on economic frustration when the proper time comes."

Defendant's counsel have made similar predictions as to what this Court will do, and this has been an important factor in persuading declarant into making this request. Defendant's counsel, however, have never made such statements in the presence of the court, nor have such statements heretofore been called to the attention of the Court.

To aid the Court in deciding this motion and request, declarant submits the following:

In *Texaco, Inc. v. Chandler*, 354 Fed.2d, 655, certiorari denied, 383 U.S. 936, the court held that proper administration of justice requires of a judge not only actual impartiality but also the appearance of detached impartiality.

In the case of *In re Honolulu Consolidated Oil Co.*, 9th Circuit, 243 Fed. 348, a judge was disqualified from hearing a case if he owned stock in an oil company which was a party to the case.

Where an irrigation district issued bonds and some of the bonds were held by a bank and a judge held stock in the bank, the judge thereby became interested in the bonds of the irrigation district by virtue of his ownership of stock in the bank (see *Adams v. William O. Miner*, 121 Cal. 372). The judge was therefore disqualified from acting on the case irrespective of the pecuniary value or interest, and the fact that the judge disposed of his stock before decision does not remove his disqualification. The analogy between that case and the present situation is that whereas the bank had an interest in the irrigation district that was the subject of the action, we have the situation that Union has an interest in Texas Gas Transmission by virtue of its partnership connection and the sale of gas. Therefore, the ownership of stock in Union is in the same category as the ownership of stock by the bank in the irrigation district.

The court further said,

"We can see no substantial difference in the case of a judge who was a stockholder in a corporation sitting in a case brought by or against such corporation, and a case where the matter in controversy involves the property of such corporation, although it is not a party to the action."

That declarant is transmitting a copy of this declaration together with a letter of transmittal (copy of which is attached), to HON. ALBERT LEE STEPHENS, JR., Senior Judge, U. S. District Court, for the Central District of California, U. S. Courthouse, Los Angeles, California 90012.

WHEREFORE, plaintiff requests that this Judge excuse himself from the trial of this action and return this cause to the Senior Judge for reassignment.

Dated: October 28, 1975.

Respectfully,

(s) Walter H. Young
WALTER H. YOUNG

Susbcribed and sworn to before me this 28th day of October, 1975.

(s) Adeline M. Young
Adeline M. Young
Notary Public

### DECLARATION OF SERVICE BY MAIL

(U. S. District Court, Central District, Local Rule 5[b][3].)

Edith C. Lee, the undersigned, hereby declares:

That declarant is a citizen of the United States and is employed by YOUNG & YOUNG, Attorneys at Law, 606 S. Olive St., Suite 2104, Los Angeles, California 90014. Declarant is over the age of twenty-one years, and not a party to the within action.

On October 28, 1975, at the direction of WALTER H. YOUNG, a member of the Bar of the United States District Court for the Central District of California, I served the within REQUEST TO HON. A. ANDREW HAUK, JUDGE, TO EXCUSE HIMSELF FROM THE TRIAL OF THIS ACTION AND RETURN THE CAUSE FOR REASSIGNMENT on the attorneys of record for the defendant and counterclaimant in this matter by mailing an envelope, with postage thereon, containing a true copy of the said document, addressed as follows:

McCUTCHEN, DOYLE, BROWN & ENERSEN
Attorneys at Law
601 California St., Suite 2000
San Francisco, California 94108
Attention: Lynn H. Pasahow, Esq.

and

James L. Hunt, Esq.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Los Angeles, California, this 28th day of October, 1975.

(s) Edith C. Lee
Edith C. Lee

■■■■■■

CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES — GENERAL

Case No. _CV 74-2374 __ ~H_     Date _Dec. 2, 1974_

Title _People of State of Calif vs. Roger C. B. Morton, Sec of Interior_

DOCKET ENTRY

Hearing on mot of Western Oil & Gas to intervene, cross motions for summary judgment. Order atty Wm Cohen, Dept of Justice, admitted to appear for purpose of this case. Court recuses itself from this case purs Code of Judicial Conduct; + signs ord of disqualification. Ord Clk serve copies on all counsel & Judge Stevens.

PRESENT:

HON. _A. Andrew Hauk_ , JUDGE

_E. Guarnieri_      _Donna K. Fitzsimons_
Deputy Clerk      Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:     ATTORNEYS PRESENT FOR DEFENDANTS:

Roger West, AUSA      John P Meck, Norman N. Flette
William Cohen, Dept of Justice     Deputy atty General State

                                      Philip Verleger

PROCEEDINGS: Hearing on motion of Western Oil & Gas Association to intervene; cross motions for summary judgment.

Order attorney William Cohen, Dept of Justice, admitted to appear for this case. Court recuses itself from this case pursuant to Code of Judicial Conduct, & signs order disqualifying & reassigning case. Order clerk serve copies all counsel + Judge Stevens.

OCT 17 1975

I hereby attest and certify on ___ that the foregoing document is a full, true and correct copy of the original on file in my office and in my legal custody.

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

By ___ Deputy

MINUTES FORM 11
CIVIL             D — M            Initials of Deputy Clerk

## Union Oil and Gas Division

Union's domestic crude oil production averaged 263,100 barrels a day in 1972, down two percent from 1971 production. Domestic natural gas production rose one percent to a record 1.57 billion cubic feet per day. Plant production of natural gas liquids declined slightly to 36,200 barrels a day.

The company's U.S. crude oil reserves at the end of 1972 totaled 717 million barrels compared with 766 million barrels a year earlier. Net natural gas reserves at year end were 7.05 and 7.16 trillion cubic feet in 1972 and 1971, respectively.

In 1972, we participated in drilling 298 wells, of which our share was the equivalent of 184 wells. This included the equivalent of 97 successful oil wells, 34 successful gas wells and 53 that were unsuccessful and abandoned.

### Louisiana

In September, the company and two partners acquired nine tracts at a Federal government lease sale offshore eastern Louisiana. The nine tracts totaled over 43,000 acres, and Union's net outlay was $11.4 million for a 38 percent interest. An evaluation well currently is being drilled, and several more are scheduled this year.

Offshore drilling in 1972 included continuing evaluation of 11 tracts acquired with the same partners in December 1970. Four of these tracts have been proven productive to date. Platforms have been installed on three of them with a fourth to be installed this year. Two additional tracts may be productive but will require further drilling to evaluate.

Development drilling activity offshore Louisiana included 17 wells drilled

Drilling proceeds from platform D in the Attaka field, East Kalimantan, Indonesia. The ship on the right provides power and service for drilling, and accommodations for the crew. The workboat in the foreground flies the Indonesian national flag and the Union Oil house flag

from new platforms on Ship Shoal Block 208, Ship Shoal Block 274 and South Marsh Island Block 48. Ten more wells will be drilled in 1973 and production from these platforms of about 4,000 barrels per day of oil and 75 million cubic feet of gas will begin late in the year.

### Texas

A gas discovery was made some 60 miles southeast of Pecos on 11,500 acres in which Union has a 50 percent interest. Called Elsinore Cattle Co. No. 1, the well tested at over 8 million cubic feet of natural gas per day from below 12,600 feet. A follow-up well now is drilling.

### Oklahoma

In April 1972, Union completed its Bruner No. 1 gas well in the Anadarko Basin. The discovery was completed below 24,000 feet to become the world's deepest producing well. Development drilling to determine the extent of the field is now in progress.

### California

In the Santa Barbara Channel, drilling from two platforms on Block 402 is complete. Current production is approximately 34,600 barrels per day (7,200 net to Union) from 84 producing wells. Government approval for a third platform was granted and then suspended. The Federal District Court recently upheld the government's refusal to lift its suspension order and an appeal is planned. The suspension order continues to delay our development program. No exploratory drilling was done by Union or others in the Santa Barbara Channel during 1972 due to continuing Federal government restrictions.

The Union Island gas field, approximately nine miles southwest of Stockton, was extended with completion of a new discovery well early in 1972. The well, Sonol Securities #1A, and a confirmation well were completed flowing 4.5 and 7.0 million cubic feet of natural gas per day, respectively. A well completed early in 1973 found a new deep gas zone, extending the

producing area of the field. Further development of this field, located on an 8,000 net acre lease block, continues in 1973.

### Alaska

Our holdings in the Cook Inlet area make Union the largest producer of crude oil and natural gas in Alaska. Furthermore, production is being maintained at high levels by successful secondary recovery procedures.

Construction was completed during the year of a gas transmission system to carry gas from production platforms on the west side of the Cook Inlet to the Kenai Peninsula. This eliminates flaring of gas produced with crude oil and delivers it to Collier Carbon and Chemical Corporation's ammonia-urea plant for use as fuel gas, and to the Swanson River oil field for pressure maintenance injection. Gas deliveries through the system after completion late in 1972 averaged 28 million cubic feet per day. In the future it will allow us to use, or market, our yet-undeveloped natural gas reserves on the west side of the Cook Inlet.

Activity on Alaska's North Slope, where Union holds 228,000 net acres, continues to be curtailed due to the lack of a permit from the Federal government for construction of an 800-mile pipeline to the warm water port of Valdez, Alaska. Evaluation of our leases, some of which are near discoveries by other companies, can begin shortly after such permission is granted.

### Union International Oil Division

Operating through subsidiaries, the company's net crude oil production from areas outside the United States averaged 63,700 barrels per day, a new record and up 14 percent from 1971. Natural gas production averaged 61 million cubic feet per day, up 21 percent from 1971 and also a new record level.

We also participated in drilling 150 wells, equivalent to 68 net wells, in

of production practices for specific reservoirs. New reservoir flooding processes are in various stages of development and testing, and improved techniques for maximizing productivity of individual wells were tested in the field. For example, a new fluid was developed for use in drilling and well repair. Results of several field applications have demonstrated that it causes less permanent plugging of the well face than do conventional fluids. Therefore, higher oil production rates are realized.

To maximize flexibility and minimize costs, the Marine Department is using the same ship's tanks for crude oil and refined products. The success of this venture depends upon adequately and economically cleaning the tanks before loading refined products and at the same time meeting environmental restrictions. Research helped develop and monitor a successful cleaning technique which is now in use.

## Shareowners and Employees

Union Oil Company common and preferred shares are held by over 140,000 individuals, business firms, labor unions, mutual funds, pension funds, educational, religious and charitable institutions and others. Shareowners reside in each of the 50 states, the District of Columbia and in many foreign countries.

At year end 16,263 people were employed by Union Oil Company and its subsidiaries, compared to 16,473 at the end of 1971.

The company's 1972 salary, wage and benefit expense amounted to $242 million compared with $222 million in 1971. These costs will increase comparably during 1973 as a result of new inflationary labor contracts forced upon us by guideline standards established by the Federal government.

The company has a stated policy of equal opportunity for all with respect to hiring, promotion and all other personnel practices and policies. We are committed to a program of affirmative action in hiring and advancement of minorities and women to permit their promotion to positions of greater responsibility and higher skill commensurate with their qualifications.

In 1972, the Union Oil Company of California Foundation continued its program of assisting educational, welfare and civic organizations. Emphasis centered on scholarships and fellowships in fields of vital interest to the future of the company, as well as continued aid programs to assist disadvantaged students to obtain higher education.

Union's float depicting the "Keystone Cops" won the Judges Special Award in the 1973 Pasadena Tournament of Roses. This award is for the float displaying the best humor in the parade.

Extract 1972 Union Annual Report

# ENERGY RESOURCES

Ray A. Burke, Senior Vice President

**"A major effort was made to increase worldwide production of crude oil, natural gas and geothermal steam while, at the same time, increasing exploration for more and new energy resources."**

Union's worldwide crude oil production in 1973 averaged a record 344,100 barrels a day, up five percent from 1972 production. The increases were all in our foreign production, which more than offset declines in domestic production.

Natural gas production fell six percent to 1.53 billion cubic feet per day in 1973. However, 1974 gas production is expected to increase reflecting new production brought on stream in late 1973 and expected to be placed on production in early 1974. Plant production of natural gas liquids also declined slightly to 35,600 barrels per day.

Worldwide crude oil reserves at the end of 1973 declined to 1,020 million barrels compared with 1,085 million a year earlier. Natural gas reserves rose to 7.7 trillion cubic feet from 7.6 trillion cubic feet at the end of 1972.

Capital investments to acquire, explore and develop oil, gas and geothermal properties totaled $276 million in 1973. We now have developed significant geothermal steam reserves which are contributing to revenues.

During the year, we participated in drilling 429 wells, of which our share was the equivalent of 256 net wells. This included the equivalent of 120 successful oil wells, 49 successful gas wells and 87 that were unsuccessful and abandoned.

### Union Oil and Gas Division

Our efforts to increase domestic production and reserves are centered primarily in the Gulf of Mexico where Union has been a major producer since we drilled the world's first offshore well there

in 1937. During 1973 we were successful in gaining good competitive land positions in two major Federal offshore lease sales and are making intensive preparations for anticipated further sales in 1974.

In June we acquired varying interests in six tracts off western Louisiana and Texas for a net company expenditure of $32.6 million. Early drilling on these properties has resulted in two tracts being proved gas productive. Drilling on these and other tracts will continue throughout 1974.

The second major sale, late in December, covered leases in the eastern part of the Gulf of Mexico off Mississippi, Alabama, and Florida. In this sale Union with two partners acquired interests in 14 tracts for a net company expenditure of $50.4 million. Exploratory work on these tracts is planned for 1974.

We also carried on an active exploratory and development drilling program in other parts of the Gulf area during the year. In total, we participated in drilling 21 onshore and offshore exploratory wells in the Gulf area.

Development drilling on proved properties in the Gulf has continued throughout the year. Production from new platforms at Ship Shoal Block 208 and Ship Shoal Block 274 is averaging 4,500 barrels of oil and 50 million cubic feet of gas daily. A third platform, at South Marsh Island Block 48, is scheduled to begin production in early 1974.

Platform, Ship Shoal Block, Gulf of Mexico. After construction was started it is now 40 million cubic feet of natural gas a day being flowed to homes and industries in the Northeast.

**Extract 1973 Union Annual Report**

## Energy Resources

Union responded to the growing shortage of reliable long-term sources of energy through acceleration of an already active exploratory and development program in 1974 Measured in dollars, Union's capital expenditures for energy resources were nearly double the previous high year of 1968 Our drilling activity was 20 percent above the previous year

Worldwide production of crude oil declined slightly from record 1973 levels reflecting a continuation of steadily increasing foreign production and decreasing domestic production as shown in the chart on page 5. Natural gas production showed a slight increase over 1973 after being down the previous year.

The seeming inconsistency between our increased effort to find new oil and the decline in our production is the result of the long lead time between the acquisition of land—the purchase of offshore leases, for example—and actual production. Although instances where we are able to achieve sustained production within a year or two after beginning exploration seem to be more highly publicized, these are exceptions to our general experiences.

It normally takes three to five years from the time we acquire a property until it becomes a producing oil or gas field, if at all. Thus increased activity in 1974 hopefully will bear fruit in 1976 or beyond and then only as the result of a cumulative long-term effort.

During 1974 Union was active in 28 states of the United States and in 17 other countries Worldwide crude oil production averaged 328,500 barrels a day and natural gas production averaged 1.5 billion cubic feet per day.

Net worldwide crude oil reserves totaled 1 015 billion barrels compared with 1.020 billion barrels at the end of 1973. Our oil reserves would have been up instead of down were it not for a 27 million barrel reserve loss in Canada reflecting an arbitrary increase in provincial royalties made during the year. Natural gas reserves at year end were 7.4 and 7.7 trillion cubic feet in 1974 and 1973 respectively. Geothermal resources reserves equivalent to 56 million megawatt hours of electric power generating potential are becoming increasingly important to the company.

### Union Oil and Gas Division
In our effort to secure promising exploratory prospects, Union spent $184 million at four Federal land sales in the Gulf of Mexico in 1974. These included

Extract 1974 Union Annual Report

various interests in over 280,000 acres in 36 tracts offshore from Texas and Louisiana.

Exploratory work on these and other tracts in this area acquired in recent years has been the major thrust of our domestic exploration effort during the year. Results to date of this drilling have been encouraging with seven of the tracts drilled in 1974 making new discoveries which indicate commercial potential. An aggressive exploration program in the Gulf of Mexico will continue to be emphasized during 1975.

At the same time there are significant exploration opportunities remaining onshore as evidenced by a number of successful 1974 developments. Most notable among these has been follow-up drilling to our December 1973 gas-condensate discovery in Mobile County, Alabama, our first discovery in that state. Following a second well, which was unsuccessful, three additional productive wells have been drilled in what is now designated as the Chunchula field. These wells have been drilled on a 10,000 acre exploratory unit in which Union has a 77 percent interest and each has produced on test at rates up to 3 million cubic feet per day and over 1,100 barrels per day of condensate from a depth below 18,000 feet. In addition to the exploratory unit, Union has a 100 percent interest in approximately 52,000 acres in this area. Drilling to further evaluate the extent of this field will continue throughout 1975.

Another area of major interest is the North Slope of Alaska where drilling has been deferred because of repeated delays in approval of the trans-Alaska pipeline. With this approval finally obtained in 1974 preparations were underway at year end for the drilling of our first well in several years on the Slope and our first well near the Prudhoe Bay field. Our objective will be to extend the Lisburne formation production at Prudhoe Bay field eastward onto a large block of land we hold jointly with another company.

Opportunities continue to be developed in proximity to some of our older producing areas in the United States. Typical of these is Union's 1974 discovery and development of the Quest field in Wyoming, where we have drilled six wells to date with a production capability of about 750 barrels of oil per day. Another example is a recently announced new fault block discovery on a state lease in the Caillou Island area of Louisiana. This discovery well, in which Union has a 60 percent interest, flowed at a rate of 10.7 million cubic feet per day of gas and 435 barrels per day of condensate in an area which has

Extract Union 1974 Annual Report

LAW OFFICES
## YOUNG & YOUNG

ATTORNEYS AND COUNSELORS

WALTER H. YOUNG
W. HERBERT YOUNG
JANE YOUNG

CITY NATIONAL BANK BUILDING
606 SOUTH OLIVE STREET, SUITE 2104
LOS ANGELES, CALIFORNIA 90014

TELEPHONES
626-5200
626-5209
625-6370
625-3912

October 28, 1975

Hon. A. Andrew Hauk, Judge
U. S. District Court
Federal Courthouse
Los Angeles, California

2 8 1975 AAH

*Mr Clerk —
File + Put on calendar
for Motion under
17 day rule AH
2 8 1975 AAH
(Local Rule 3(e))*

Re:  MAVIS vs. COMMERCIAL CARRIERS, INC.
     USDC Number:  CV 74-2708 AAH

Dear Sir:

Enclosed is copy of "Request under Section 455 Title 28
to excuse yourself from the trial in this action and
return the cause for reassignment."

I have sent copies to defendant's counsel and a copy to
Judge Stephens and copies of same are attached to the
Request.

"I have not actually scheduled a Motion on this Request
as it is my understanding that it is proper to call the
facts to the attention of the Court in this matter,
rather than in the form of a formal Motion.

If your Honor feels that this Request should be made in
the form of a formal Motion, I will schedule the same
accordingly."

Respectfully,

WALTER H. YOUNG

WHY:jp
Encl.

cc:  McCutchen, Doyle, Brown & Enersen
     Hon. Albert Lee Stephens, Jr.

LAW OFFICES
## YOUNG & YOUNG
CITY NATIONAL BANK BUILDING
606 SOUTH OLIVE STREET, SUITE 2104
LOS ANGELES, CALIFORNIA 90014

ATTORNEYS AND COUNSELORS
WALTER H. YOUNG
W. HERBERT YOUNG
JANE YOUNG

TELEPHONES
628-5200
628-5209
625-8370
625-3912

October 28, 1975

McCutchen, Doyle, Brown & Enersen
Attorneys at Law
601 California St., Suite 2000
San Francisco, California 94108

Attention:   Lynn H. Pasahow, Esq.
and
James L. Hunt, Esq.

Re:   TEXAS GAS TRANSMISSION

Gentlemen:

In connection with my request to Hon. A. Andrew Hauk, Judge, pursuant to Section 455, Title 28 U.S. Code, would you please supply me by return mail with the following information:

(1)   Latest figures on the annual dollar amount of sales of gas by Union Oil to Texas Gas Transmission or its subsidiaries.

(2)   Description of all joint ventures and partnership ventures in which Texas Gas Transmission and Union Oil Company are involved in in Louisiana and Gulf of Mexico and elsewhere, and the approximate amount of venture capital involved.

Very truly yours,

WHY/el                                    WALTER H. YOUNG

LAW OFFICES

**YOUNG & YOUNG**

ATTORNEYS AND COUNSELORS

WALTER H. YOUNG
W. HERBERT YOUNG
JANE YOUNG

CITY NATIONAL BANK BUILDING
606 SOUTH OLIVE STREET, SUITE 2104
LOS ANGELES, CALIFORNIA 90014

TELEPHONES

628-5200
628-5209
625-8370
625-3912

October 28, 1975

Hon. Albert Lee Stephens, Jr.
Senior Judge
United States District Court
Courthouse
Los Angeles, California  90012

Re:  MAVIS vs. COMMERCIAL CARRIERS, INC.
USDC Number:   CV 74-2708 AAH

Request to Return Cause for Reassignment

Dear Sir:

Enclosed is copy of a Request to Hon. A. Andrew Hauk, Judge, to excuse himself from the trial of this action and return the cause to you for reassignment.

This Request has been filed and a copy delivered to Judge Hauk and service has been made on defendant's counsel.

I submit this copy to you so you will have the papers available before you in the event Judge Hauk should contact you concerning same and further, as I understand that this is the proper practice so to do.

Respectfully,

WALTER H. YOUNG

WHY:jp
Enc.

cc:  McCutchen, Doyle, Brown & Enersen
Hon. A. Andrew Hauk

SUPPLEMENTAL DECLARATION OF WALTER H. YOUNG
RE MOTION UNDER SECTION 28 U. S. CODE
SECTION 455

STATE OF CALIFORNIA ⎱
COUNTY OF LOS ANGELES ⎰ ss.

WALTER H. YOUNG does hereby and herewith certify and declare under penalties of perjury that the following facts are true:

(1) Following receipt of the Order of October 30th, 1975 of the Order setting for hearing as a Motion plaintiff's request to HON. A. ANDREW HAUK to excuse himself from the trial of this action, declarant made or caused the following things to be done:

(a) Caused inquiry to be made at the Federal Energy Office, the Federal Power Commission, the Security and Exchange Commission and the Interstate Commerce Commission as to where, could be located, a record of partnership or joint ventures between Texas Gas Transmission and Union Oil Company of California in connection with the exploration, production and transmission of natural gas and received information from all of said agencies, that generally such transactions were handled by private agreements and specific identity not disclosed. That declarant ascertained that in the field of oil and natural gas, Texas Gas Transmission filed its reports with the Federal Power Commission and declarant has obtained a copy of the report, approximately two inches thick of Texas Gas Transmission for the year ending December 31st, 1974 and said report does not identify its transactions with Union Oil Company of California as such.

(b) That on October 28th, 1975, declarant wrote a letter to defendant's counsel, copy of which is attached, requesting information as set forth in said letter and although declarant has been informed by Mr. Hunt, that Mr. Malone of Texas Gas Transmission had mailed said information to them, declarant has not yet received the same.

(c) That declarant assembled authorizations from four shareholders of Union Oil requesting that Union Oil disclose to declarant information on the joint ventures between Texas Gas Transmission and Union Oil of California, but declarant finally ascertained that such records were in the Houston, Texas office, under the jurisdiction of Bob Marquez, phone: 1–713–623–8000 and declarant talked to Mr. Marquez who informed declarant that such records could not be released except by authority of the main office and declarant finally talked to Sam A. Snyder of the legal department of the Union Oil Company who informed declarant that there was a policy of Union Oil Company not to aid either party to litigation, but that if a joint request was filed that Union Oil Company of California would supply said information. That in connection with said inquiries, at no time did declarant disclose the name of HON. A. ANDREW HAUK, but merely informed the parties involved that said information was requested in connection with litigation concerning Texas Gas Transmission.

That declarant on November 5th, 1975 informed Mr. Hunt of what had occurred and requested him to join in a request with declarant for said information and Mr. Hunt informed declarant that he wanted to talk to Mr. Snyder first.

At the deposition in Washington on November 10th of Mr. Charles Ephraim, Mr. Hunt informed declarant that he had not been able to make contact with attorney Sam A. Snyder of Union Oil, but that he did have under consideration my request for a joint request and also informed declarant that he understood that Mr. Malone had already mailed out information on this subject to him.

That declarant has made due and diligent search to ascertain from public records and public sources the nature, scope and extent of the partnership in joint transactions between Texas Gas Transmission and Union Oil Company of California and that none of said information is available from public sources, but can only be obtained from Texas Gas Transmission and Union Oil Company of California and for which, apparently, the cooperation of Texas Gas Transmission is required and declarant has made due and timely and appropriate request for said information from defendant's counsel, none of which has been supplied as of November 12, 1975.

(2) That extracts from the Federal Power Commission report 1974 of Texas Gas Transmission do reveal the following:

(a) That gas operating revenues of Texas Gas Transmission in 1974 amounted to $346,108,382.00.

(b) That its oil and gas producing activities are handled through Texas Gas Exploration in Louisiana, Delaware, Netherlands, United Kingdom and in the Artic region and that said Texas Gas Exploration Companies are 100% owned by Texas Gas Transmission. Said report also indicates that there are three commercial carriers wholly owned subsidiaries, one in Michigan, one in Delaware and one in Illinois.

(c) That Texas Gas Transmission is guaranteed a $35,000,000.00 Note of Texas Gas Exploration Corporation, its wholly subsidiary.

(3) That declarant was informed at the Owensburg deposition by Mr. Herrick that Texas Gas Transmission obtains a great deal of its gas from Union Oil of California. Since revenues produced in the gas amount to $346 million, it is obvious that the gas obtained from Union Oil runs into many, many millions of dollars.

(4) That attached hereto is Standard & Poors circulated brochure on Texas Gas Transmission which reflects that it owns Commercial Carriers and that it conducts its well drilling activities through Texas Gas Exploration operating in the North Sea, United Kingdom, Wyoming and another report attached hereto indicates that Texas Gas Transmission is operating in Louisiana and Texas.

(5) Extracts from the Union Oil Company Annual Reports reflects that Union Oil Company produces 1.5 billion cubic feet of natural gas

per day, that its efforts to increase domestic production are centered in the Gulf of Mexico, that they have varying interest in tracts in Louisiana and Texas and that Union Oil was doing exploratory work through partners in the Gulf of Mexico, Louisiana and are producing millions of cubic feet of gas in that area.

(6) That it is apparent from the foregoing that the oil exploration and gas producing activities of Union Oil Company of California and Texas Gas Exploration (a subsidiary wholly owned) are taking place in the Gulf of Mexico and Louisiana, that the investments run into hundreds of millions of dollars, that there are great amounts of gas being produced and that Texas Gas Transmission is obviously buying millions of dollars of gas from Union Oil and the statements made to declarant as heretofore set forth by Mr. Herrick and Mr. Malone that Texas Gas Transmission and Union Oil Company of California were joint venturers in the Gulf of Mexico and Louisiana establishes partnership interests between these companies involving great amounts of money. Attached hereto are extracts from the Financial Report of Texas Gas Transmission from 1974 indicating risk of well damage in the Gulf of Mexico with Hurricane Carmen. It also reflects that the companies sold 696 billion cubic feet of gas and 77% was obtained from independent producers. The pipeline map indicates that gas for its pipelines is supplied from sources in Louisiana and the Gulf of Mexico. The report further establishes that Texas Gas Exploration, through its own efforts, produces only 5% of the system requirements of gas.

The 1974 report also indicates an economic problem in that the free market price for gas is $2.00 per 1,000 cubic feet and the federally regulated interstate rate is set at 50¢; therefore, the partnership risks between Union Oil and Texas Gas Transmission may weigh as much in favor of losses as in gains. The report also indicates that a trucking service division was down 41%.

Executed at Los Angeles, California this 12th day of November, 1975.

(s) Walter H. Young
WALTER H. YOUNG

Subscribed and sworn to before me
this 12th day of November, 1975

(s) Adeline M. Young
Adeline M. Young, Notary Public

Annual report of Texas Gas Transmission Corporation                Year ended December 31, 19 74

## CORPORATIONS CONTROLLED BY RESPONDENT

1. Report below the names of all corporations, business trusts, and similar organizations, controlled directly or indirectly by respondent at any time during the year.  If control ceased prior to end of year, give particulars in a footnote.

2. If control was by other means than a direct holding of vot-

ing rights, state in a footnote the manner in which control was held, naming any intermediaries involved

3. If control was held jointly with one or more other interests, state the fact in a footnote and name the other interests.

| Name of Company Controlled (o) | Kind of Business (b) | Percent Voting Stock Owned (c) | Foot-note Ref. (d) |
|---|---|---|---|
| American Commercial Lines, Inc. | Barging, manufacturing, | 100(a) | |
| Amcom, Inc. | terminals, trucking, | 100(b) | |
| American Commercial Barge | dredging | | |
| Line Company | | 100(b) | |
| American Barge Line Company | | 100(b) | |
| Bauer Dredging Co., Inc. | | 100(b) | |
| Bauer Dredging & Construction Co., | | | |
| Inc. | | | (1) |
| Bauer Dredging International Corp. | | 100(c) | |
| Commercial Carriers, Inc. (Mich.) | | 100(b) | |
| Commercial Carriers Co. of Delaware | | 100(d) | |
| Commercial Carriers, Inc. (Ill.) | Inactive | 100(d) | |
| Commercial Transport Corporation | | 100(b) | |
| Inland Tugs Co. | | 100(b) | |
| Jeffboat, Incorporated | | 100(b) | |
| Louisiana Dock Company, Inc. | | 100(b) | |
| The Southland Towing Company, Incorporated | | 100(b) | |
| Transfer Terminal Corporation | | 100(b) | |
| Terminal Transport Company, Inc. | | 100(b) | |
| Transport Brokerage, Inc. | | 100(e) | |
| Tropical Transportation Services, Inc. | | 100(h) | (2) |
| | | | |
| Overland Coal Transportation, Inc. | Coal transport | 100(a) | |
| Texas Gas Exploration Corporation(La.) | Oil and gas producing | 100(a) | |
| Texas Gas Exploration International, | | | |
| Limited | | 100(f) | |
| Texas Gas Exploration Corporation (Del.) | | 100(f) | |
| Texas Gas Exploration (Netherlands) | | | |
| Corporation | | 100(f) | |
| Texas Gas Exploration (U.K.) | | | |
| Corporation | | 100(f) | |
| Texas Gas Exploration (U.K.) Limited | | 100(g) | |
| Texas Gas Exploration Limited | | 100(a) | |
| Texas Gas Exploration Arctic, Limited | | 100(a) | |
| Texas American Corporation | Inactive | 100(a) | |
| Diversified Carriers, Inc. | Inactive | 100(a) | |
| Texam Gas Transmission Limited | | 100(a) | |
| (Continued on Page 103a) | | | |

## DEFINITIONS

1. See the Uniform System of Accounts for a definition of control.

2. Direct control is that which is exercised without interposition of an intermediary

3. Indirect control is that which is exercised by the interposition of an intermediary which exercises direct control.

4. Joint control is that in which neither interest can effectively

control or direct action without the consent of the other, as where the voting control is equally divided between two holders, or each party holds a veto power over the other.  Joint control may exist by mutual agreement or understanding between two or more parties who together have control within the meaning of the definition of control in the Uniform System of Accounts, regardless of the relative voting rights of each party

Annual report of  Texas Gas ᵐ ᵃnsmission Corporation                Year ended December 31; 19 74

| CORPORATIONS CONTROLLED BY RESPONDENT (Continued) | | | |
|---|---|---|---|
| Name of Company Controlled (a) | Kind of Business (b) | Percent Voting Stock Owned (c) | Foot-note Ref. (d) |
| Indiana Gas Utility Corporation | Inactive | 100(a) | |
| Kentucky Natural Gas Company, Inc. | Inactive | 100(a) | |
| Memphis Natural Gas Corporation | Inactive | 100(a) | |
| ACBL Western Inc. | | 100(a) | (3) |
| Texam Offshore Gas Transmission, Inc. | | 100(a) | (4) |

(a)  Owned by respondent.
(b)  Owned by American Commercial Lines, Inc.
(c)  Owned by Bauer Dredging Co., Inc.
(d)  Owned by Commercial Carriers, Inc. (Mich.)
(e)  Owned by Terminal Transport Company, Inc.
(f)  Owned by Texas Gas Exploration Corporation (La.).
(g)  Owned by Texas Gas Exploration (U.K.) Corporation.
(h)  Owned by Transport Brokerage, Inc.

(1)  Merged into Bauer Dredging Co., Inc.
(2)  Incorporated in 1974.
(3)  Formerly Marlin, Inc.
(4)  Formerly South-Am, Inc.

84

## IMPORTANT CHANGES DURING THE YEAR

Hereunder give particulars concerning the matters indicated below   Make the statements explicit and precise and number them in accordance with the inquiries   Each inquiry should be answered   If "none" or "not applicable" states the fact, that response should be made   If information which answers an inquiry is given elsewhere in the report, reference to the schedule in which it appears will be sufficient.

1  Changes in and important additions to franchise rights  Describe the actual consideration given therefor and state from whom the franchise rights were acquired.  If acquired without the payment of consideration state that fact.

2. Acquisition of ownership in other companies; reorganization, merger, or consolidation with other companies: Give names of companies involved, particulars concerning the transactions, name of the Commission authorizing the transaction, and reference to Commission authorization.

3. Purchase or sale of an operating unit or system: Give a brief description of the property, and of the transactions relating thereto, and reference to Commission authorization, if any was required   Give date journal entries called for by the Uniform System of Accounts were submitted to the Commission.

4. Important leaseholds (other than leaseholds for natural gas lands) that have been acquired or given, assigned or surrendered  Give effective dates, lengths of terms, names of parties, rents, and other conditions.   State name of Commission authorizing lease and give reference to such authorization.

5. Important extension or reduction of transmission or distribution system: State territory added or relinquished and date operations began or ceased and give reference to Commission authorization, if any was required.   State also the approximate

number of customers added or lost and approximate annual revenues of each class of service   Each natural gas company also shall state major new continuing sources of gas made available to it from purchases, development, purchase contract, or otherwise, giving location and approximate total gas volumes available, period of contracts, and other parties to any such arrangements etc.

6. Obligation incurred or assumed by respondent as guarantor for the performance by another of any agreement or obligation, excluding ordinary commercial paper maturing on demand or not later than one year after date of issue: State on behalf of whom the obligation was assumed and amount of the obligation  Give reference to Commission authorization if any was required.

7. Changes in articles of incorporation or amendments to charter: Explain the nature and purpose of such changes or amendments.

8. State the estimated annual effect and nature of any important wage scale changes during the year.

9. State briefly the status of any materially important legal proceedings pending at the end of the year, and the results of any such proceedings culminated during the year

10. Describe briefly any materially important transactions of the respondent not disclosed elsewhere in this report in which an officer, director, security holder reported on page 106, voting trustee, associated company or known associate of any of these persons was a party or in which any such person had a material interest.

11. List electric generating units placed in service during the year, giving the in-service date, location and generating capacity.

---

Items 1 through 5    None

Item 6    Respondent is guarantor of principal and interest for a $35,000,000, 7 1/4% term note payable to bank, due December 31, 1979, by Texas Gas Exploration Corporation, a subsidiary of respondent.

Respondent also is guarantor of principal ($440,000 at December 31, 1974) and interest for a note payable to bank by Kentucky Electronics Inc., a former subsidiary of respondent.

Item 7    None

Item 8    Changes in wage scales for hourly and salaried employees are estimated to increase annual costs of respondent approximately $1,416,000, excluding fringe benefit costs.

Items 9 through 11    None

Page 109 omitted intentionally.

Rev. (12-70)

No. MC-F-11685 et.el.

Under the proposed transaction in No. MC-F-11687, CCI would purchase the operating rights, carrier operating property, material and supplies, and prepayments to be acquired by Paul A. Mavis from D&M, having a net book value of $870,283, for $2,841,468, subject to adjustment to reflect changes in the materials and supplies and prepayments transferred. Of the purchase price $200,000 was deposited in escrow upon execution of the agreement, and the remainder would be payable in cash at the time of consummation of the transaction. The agreement between Paul A. Mavis and CCI covering the sale of the above mentioned rights and properties provides, among, other things, (1) that the operating rights to be acquired by CCI are validly issued and in good standing, (2) and that, if the application is denied, CCI shall have the option of cancelling the agreement, in which event Paul A. Mavis shall retain the $200,000 deposited in escrow as liquidated damages, or CCI may assign its rights under the agreement to a third person not subject to the jurisdiction of this Commission, in which event CCI shall be responsible for the payment of the entire purchase price. In order to finance the transaction CCI would receive an advance of $2,900,000 from either ACL or Texas Gas.

**TXG·**

# Texas Gas Transmission

2203

| Stock — | Price Sep. 18'75 | Dividend | Yield |
|---|---|---|---|
| COMMON ..................................... | 26⅞ | ³$1.88 | ²7.0% |
| $1.50 CONV. PREFERENCE .......... | 25¾ | 1.50 | 5.8 |

SUMMARY: This natural gas pipeline operator also has diversified interests in oil and gas exploration, inland waterway barge lines and a major trucking operation. Long-term earnings growth potential appears moderately favorable, with exploration providing some added stimulus.

TEXAS GAS TRANSMISSION

S&P 425 Industrials X

Nat Gas Pipeline Cos

X Charted on special comparable scales, values not shown

**OPER. REVENUES (Million $)**

| Quarter: | 1975 | 1974 | 1973 | 1972 | 1971 |
|---|---|---|---|---|---|
| March..... | 187.3 | 169.5 | 146.2 | 130.8 | 126.4 |
| June........ | 171.1 | 170.0 | 136.4 | 133.4 | 114.4 |
| Sept. ....... | | 165.2 | 139.2 | ⁵113.4 | 114.8 |
| Dec......... | | 187.9 | 169.3 | 143.0 | 119.4 |

Total operating revenues for the six months ended June 30, 1975, rose 5.6%, year to year, as higher gas transmission and barging receipts more than offset declines in trucking and oil and gas revenues. Margins narrowed significantly, however, and operating income fell 15.9%. After 7.5% lower other income and a 3.1% reduction in interest expense and other deductions, net income dropped 22.5%. Share earnings of $2.01 compared with $2.60; a provision for deferred taxes relating to intangible drilling and development costs incurred after January 1, 1975, reduced 1975 interim earnings by $0.11.

For the three months ended June 30, 1975, total operating revenues inched ahead 0.6%, year to year. Earnings for all four major lines of business declined, and net income was down 31.4%. Share earnings were $0.96, compared with $1.41.

**¹COMMON SHARE EARNINGS ($)**

| Quarter: | 1975 | 1974 | 1973 | 1972 | 1971 |
|---|---|---|---|---|---|
| March..... | 1.05 | 1.19 | 1.04 | 0.72 | 0.85 |
| June........ | 0.96 | 1.41 | 0.87 | 0.87 | 0.78 |
| Sept. ....... | | 1.03 | 0.83 | ⁴d0.13 | 0.71 |
| Dec......... | | ⁶0.95 | 1.33 | 0.66 | 0.79 |

## PROSPECTS

Share earnings for 1975 are forecast at $4.40 (before a possible nonrecurring charge of $0.69 relating to a proposed accounting change), against 1974's $4.58. Sharply lower oil and gas earnings, reflecting FEA price rollbacks and an accounting change, and the recessionary impact on trucking should offset an improved barging contribution; pipeline earnings should be little changed. Dividends are at $0.47 quarterly.

Under gas shortage conditions, TXG is curtailing contracted sales volume an estimated 18.0% for the 12 months commencing April 1, 1975. Longer term, an aggressive gas exploration program, proposed pipeline expansions offshore Louisiana and Texas, and a possible coal gas project could help stabilize deliveries at reasonable levels, while pipeline earnings progress would be importantly affected by FPC rate regulation. Diversified operations (55% of 1974 earnings) are of growing importance, with the American Commercial Barge Line and the Jeffboat shipyard benefiting from the high level of coal, grain and chemicals traffic. Trucking Services' area coverage is being expanded, although regulatory lag at the ICC and reduced auto demand are hurting.

TXG is active in oil and gas exploration and production activities, spending $23.6 million in 1974 and budgeting about $16 million for 1975. Output of crude oil and gas is rising, but FEA price rollbacks on extracted products are depressing current earnings.

An FPC rate increase settlement for the pipeline in December, 1974, granted $23 million of a $31 million request collected subject to refund since April 1, 1974. A new request for $28 million, based on a 13% return on equity, is being collected since April 1, 1975.

## DIVIDEND DATA

Common dividends in the past 12 months:

| Amt of Divd $ | Date Decl | Ex-divd Date | Stock of Record | Payment Date |
|---|---|---|---|---|
| 0.44... | Nov. 14 | Nov. 22 | Nov. 29 | Dec. 15'74 |
| 0.44... | Feb. 10 | Feb. 24 | Feb. 28 | Mar.15'75 |
| 0.47... | May 14 | May 23 | May 30 | Jun. 15'75 |
| 0.47... | Aug. 4 | Aug. 25 | Aug. 29 | Sep. 15'75 |

¹Listed N.Y.S.E., com also listed Mid-west & Pacific S.Es & traded Boston S E.   ²Indicated rate.   ³Based on com shs. & com. sh. equivolents (pref stk & com & pref stk. options).   ⁴Aft $0.90 loss on sale of discont. opers   ⁵Excl. Crestwave Offshore Services for 9 mos.   ⁶Aft $0.43 write-off.

STANDARD N.Y.S.E. STOCK REPORTS                     STANDARD & POOR'S CORP.

Reproduction in whole or in part without written permission is strictly prohibited   All rights reserved

Published at Ephrata, Pa. Editorial & Executive Offices, 345 Hudson St., New York, N.Y. 10014

Vol. 42, No. 185            Wednesday, September 24, 1975            Sec. 30

ROBERT K. PERKINS
PAINE, WEBBER, JACKSON & CURTIS, INC.
555 SOUTH FLOWER STREET
P. O. BOX 30190, TERMINAL ANNEX
LOS ANGELES, CALIF. 90030

## 2203     TEXAS GAS TRANSMISSION CORPORATION

### 'INCOME STATISTICS (Million $) AND PER SHARE ($) DATA

| Year Ended Dec 31 | Total Oper. Revs | Depr., Depl. & Amort. | Depr & Maint. | — % of Oper Revs — Maint. | 'Oper Taxes | 'Oper Ratio | #Fx Chgs Pref & Pfd Divs. Tms Erns. | 'Net Inc. | —'Common Share ($) Data— 'Earns. | Divs. Paid | Price Range | Price-Earns. Ratios HI LO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1975-- | ---- | ---- | --- | --- | --- | --- | --- | --- | --- | 1.38 | 33½–23½ | ----- |
| 1974-- | 692.56 | 59.36 | 29.83 | 12 9 | 8.0 | 90.1 | 2 24 | 44 57 | * 4.58 | 1 73 | 33  –20½ | 7- 4 |
| 1973-- | 591.06 | 39 58 | 25.45 | 11.0 | 8.9 | 89.9 | 2 18 | 39.72 | * 4.07 | 1.62½ | 40  –22½ | 10- 5 |
| 1972-- | 520 56 | 34 51 | 22.58 | 11.0 | 8.9 | 88 9 | 2.14 | 21 29 | * 2.12 | 1.56½ | 39¼–27¾ | 19–13 |
| 1971-- | 474 95 | 34.91 | 21.21 | 11.8 | 8.0 | 89 2 | 1.91 | 30 45 | * 3.13 | 1.52 | 39  –29¾ | 12–10 |
| 1970-- | 426.49 | 31.82 | 18.83 | 11.9 | 4 4 | 89.4 | 1.77 | 26 00 | * 2 79 | 1.48 | 40¼–26 | 14- 9 |
| 1969-- | 388.01 | 28.49 | 19.39 | 12.3 | 2.6 | 90.9 | 1 74 | 20 34 | * 2.24 | 1.48 | 41  –24¼ | 18–11 |
| 1968-- | 349.68 | 26.22 | 16.36 | 12.2 | 4 0 | 90.0 | 1 96 | 22 79 | * 2 53 | 1 43½ | 45  –32¼ | 20–14 |
| 1967-- | 323 65 | 25.03 | 13 81 | 12.0 | 4.4 | 89.9 | 2 01 | 22 85 | * 2 54 | 1.40 | 36¾–26½ | 14–10 |
| 1966-- | 188.89 | 16.36 | 2.99 | 10 2 | 9.1 | 88 2 | 2 82 | 15 08 | 2.59 | 1.32 | 35½–25 | 14–10 |
| 1965-- | 169.57 | 14.51 | 3 51 | 10.6 | 9.4 | 88.0 | 2 41 | 13 40 | 2.26 | 1.27 | 39¾–29¾ | 18- 13 |

### 'PERTINENT BALANCE SHEET STATISTICS (Million $)

| Dec. 31 | Gross Prop. | Capital Expend. | Depr. Res | #% Earn. Net Prop. | Long Term Debt | —% Long Term Debt of— Net Prop | Oper. Revs | Invest. Cap. | Total Invest. Cap. | ###%Earn. on Inv. Cap. | 'Com. Equity Ratio | '($) Bk. Val. Com. Sh. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1974-- | 1,015.89 | 81.64 | 395 01 | 11.0 | 366 89 * | 59.1 | 53.0 | 48 6 | 754.57 | 10.1 | 43.6 | 40.29 |
| 1973-- | 962 83 | 96.38 | 350.74 | 9.8 | 338.59 | 55.3 | 57.3 | 49.7 | 681.24 | 9.7 | 42.9 | 35.37 |
| 1972-- | 901.29 | 65 67 | 320.86 | 9.9 | 324.35 | 55 9 | 62.3 | 51.4 | 631.27 | 9.8 | 41.3 | 31.85 |
| 1971-- | 883 36 | 57 86 | 306.37 | 8.9 | 342 07 | 59.3 | 72 0 | 53 5 | 639.78 | 8.7 | 38 2 | 30 99 |
| 1970-- | 836.66 | 92.27 | 275.95 | 8.5 | 308.18 | 55 0 | 72.3 | 52.5 | 586.61 | 8.3 | 35.1 | 30.85 |
| 1969-- | 756.38 | 90.27 | 249.11 | 7.4 | 216 52 | 42 7 | 55 8 | 40 1 | 540.43 | 7.0 | 35.1 | 29.72 |
| 1968-- | 670 22 | 57.89 | 222 96 | 8 1 | 216 52 | 48 4 | 61 9 | 46.9 | 461 26 | 7.9 | 35.7 | 28.41 |
| 1967-- | 622.42 | 60.11 | 202.37 | 8.4 | 229 88 | 54 7 | 71.0 | 52.1 | 441 64 | 8 0 | 34.1 | 26.80 |
| 1966-- | 448 30 | 37.88 | 150.03 | 7.6 | 136 11 | 45.6 | 72.1 | 48.5 | 280 56 | 8.1 | 43.1 | 23.87 |
| 1965-- | 412.25 | 13.96 | 135.30 | 7.8 | 147 67 | 53.3 | 87.1 | 52 7 | 283 08 | 7.7 | 39.4 | 22.10 |

'Data for 1973 as originally reported; data for each yr prior to 1973 as taken from subsequent yr.'s Annual Report; excl. Crestwave Offshore Services from Inc. Statistics aft. 1971 (except in earns. in 1972 & 1973)—Bal Sheet ratios for 1972 & 1973 based on continuing opers.; incl American Commercial Lines aft. 1966 ²Aft depr & taxes ³Adj. for 3-for-2 split in 1966. ⁴Ratio of com. stk. & surplus to total capital. ⁵Based on bk vol. may differ from return on rate base. ⁶Primary earns (assumes conv. of pref stk & exer of options), identical with fully diluted earns ⁷Excl property taxes not separately reported in 1970 thru 1967. ⁸Aft. 1969 reflects change in FPC method of accounting for allowance for funds used during construction. ⁹Aft. $0.43 a sh. write-off of expl. exp. in 1974; aft gain of $0 35 a sh. in 1973 & loss of $1 10 in 1972 on sale of assets, bef. spec. cr. of $1.13 a sh. in 1972.

### Fundamental Position

Texas Gas Transmission derived 50% of 1974 revenues and 45% of net income from gas transmission, 18% and 25% from inland waterways, 21% and 5% from trucking, and 11% and 24% from oil and gas exploration and production.

The gas pipeline system emanates from the Louisiana Gulf Coast to serve communities along the Mississippi and Ohio River Valleys into Ohio. Gas sold during 1974 totaled 696 billion cf. and year-end available reserves were estimated at 7 trillion cf. Rates on resale gas are regulated by the FPC. In 1970, TXG reverted to normalization accounting for tax savings from accelerated depreciation. Net plant of $300 million at 1974 year-end compared with $369 a year earlier.

The Inland Waterways division owns American Commercial Lines, the nation's largest barge line, operating along the Mississippi, Ohio and Illinois Rivers, and also an inland shipyard. Ton miles transported totaled 17.1 billion in 1974, versus 16.1 a year earlier.

Trucking Services operates a major north-south commodities common carrier, and Commercial Carriers, a leading auto and truck common carrier.

Texas Gas Exploration produced 44.7 billion cf. of gas and 1,262,000 barrels of oil in 1974, and at year end held net 54,093 producing acres and 1,019,038 acres for future development. The unit also produced a net 8.7 million barrels of liquids through a 50% interest in an extraction plant.

Crestwave Offshore Services, operator of three drilling rigs, was sold in October 1973, resulting in a $3 million after-tax gain.

Common dividends have been paid regularly from 1952, averaging 47% of available earnings in the five years through 1974.

Employees: 8,200. Shareholders: 21,296.

### Finances

Property additions, investments, and acquisitions are forecast at $100 million for 1975. Financing included a $35 million seven-year term loan in 1973 and sale of $10 million of 10-year debentures in 1974. An additional $40 million debenture offering has been deferred, pending the outcome of negotiations regarding advance payments for offshore gas reserves.

### CAPITALIZATION

LONG TERM DEBT: $332,992,399.
CUM. PREFERRED STOCK: ($100 par):
$9.37½ SERIES: 100,000 shs.; red. at $109.38.
$5.40 SERIES: 4,716 shs.; red. at $100; also at $100 for s. f.
$4.96 SERIES: 26,653 shs.; red. at $100.
$1.50 CUM. CONV. PREFERENCE STOCK: 765,563 shs. ($5 par); conv. into com. share for share; red. at $31.20.
COMMON STOCK: 8,919,803 shs. ($5 par),

Incorporated in Del in 1945 Office - 3800 Frederica St, P O Box 1160, Owensboro, Ky 42301 Chmn & Chief Exec Officer --W. M Elmer, Pres --F K Rader Secy W B Thienheld VP-Treas R W Brandin Dirs W M Elmer (Chmn), A E Alexander, A Belmont, F H Blaske, E D Butcher, C K Crass, C F Delmar, Jr., R O Garrett, J W Hershey, R O Kuch, R P Laughna, V. W Maytholer, J B Morton, F M Narfleet, F K Rader, K C Vaughan Transfer Agents—Chemical Bank, NYC; Harris Trust & Savings Bank, Chicago Registrars -- Chase Manhattan Bank, NYC; Northern Trust Co, Chicago.

Information has been obtained from sources believed to be reliable but it, accuracy and completeness, and that of the opinions based thereon are not guaranteed Printed in U S A

88

| Stock — | Price Aug 5'75 | Dividend | Yield |
|---|---|---|---|
| COMMON | 46⅛ | ²$1.98 | ²4.3% |
| $2.50 CONV. PREFERRED | 60 | 2.50 | 4.2 |

**SUMMARY:** Union Oil, a predominantly domestic integrated oil with major refining and marketing interests on the West Coast and in the Midwest and contiguous areas, has a relatively strong crude sufficiency, based on its North American production, at about 61% of refining needs. Santa Barbara, California, development should be permitted to resume in time, with favorable implications. Drilling in overseas areas, including Indonesia and the North Sea, adds potential. The depletion elimination and FEA restrictions have reduced 1975 earnings, but longer-range prospects remain promising.

UNION OIL OF CALIFORNIA

**⁴TOTAL REVENUES (Million $)**

| Quarter: | 1975 | 1974 | 1973 | 1972 | 1971 |
|---|---|---|---|---|---|
| March | 1,286 | 987 | 635 | 581 | 574 |
| June | 1,293 | 1,150 | 710 | 609 | 591 |
| Sept. | | 1,264 | 747 | 631 | 582 |
| Dec. | | 1,386 | 871 | 637 | 593 |

Revenues for the first half of 1975 advanced 20.6%, year to year, primarily reflecting the higher price structure. The company's worldwide crude oil production declined 8%, with the largest part of the dip in Canada, where higher royalties and export taxes led to a 38% decline in output. The federal control programs, including FEA entitlements, crude oil allocation and new import taxes on oil cost the company a combined $112 million, and increased taxes were an added burden, penalizing profits by $22 million. Thus, earnings for the six months fell 46%, to $2.34 a share from $4.82 for the year-earlier period.

**⁸COMMON SHARE EARNINGS ($)**

| Quarter: | 1975 | 1974 | 1973 | 1972 | 1971 |
|---|---|---|---|---|---|
| March | 1.14 | 2.34 | 1.14 | 0.84 | 0.84 |
| June | 1.20 | 2.48 | 1.20 | 0.77 | 0.74 |
| Sept. | | 2.47 | 1.57 | 0.89 | 0.76 |
| Dec. | | 1.65 | 1.59 | 0.95 | 0.87 |

**PROSPECTS**

**Near Term**—Revenues should hold at relatively high levels in 1975, with higher selling prices probably more than offsetting some possible shrinkage in unit sales volumes of refined products stemming from Government programs for discouraging consumption of oil. Expected larger crude sales from the Indonesian properties should add to revenues, as should larger chemical sales.

The Federal Energy Administration program for equalizing crude oil costs, requiring payments to other refiners for so-called entitlements, will probably continue as a burden. Thus, with the domestic tax load increased by depletion elimination, earnings for 1975 may decline to about $5 a share from the $8.92 a share ($7.03 fully diluted) of 1974. Dividends at $0.49½ quarterly should continue.

**Long Term**—Expansion of overseas exploration for oil adds to potentials. The company's geothermal steam output is of growing interest.

**RECENT DEVELOPMENTS**

The company's onshore development is centered on Chunchula field, in Alabama, where six wells recently had been completed and three more were being tested. Union holds a 77% interest in the 10,000 acre discovery tract, and 25% to 100% in adjacent acreage. Union recently was producing about 114,000 barrels daily (gross) from three Indonesian fields, with two placed on production in the June quarter of 1975. Union has a 100% interest in the two new fields (Melahin and Sepinggan) under production-sharing contracts with the Indonesian state oil company. Union has found a new field in the Sepinggan area and another offshore Thailand.

**DIVIDEND DATA**

Payments in the past 12 months:

| Amt of Divd $ | Date Decl. | Ex-divd Date | Stock of Record | Payment Date |
|---|---|---|---|---|
| 0.49½ | Oct. 7 | Oct. 10 | Oct. 17 | Nov. 9'74 |
| 0.49½ | Nov. 25 | Jan. 6 | Jan. 10 | Feb. 10'75 |
| 0.49½ | Mar. 31 | Apr. 4 | Apr. 10 | May 10'75 |
| 0.49½ | Jun. 30 | Jul. 7 | Jul. 11 | Aug. 9'75 |

¹Listed N.Y.S E , also listed Midwest & Pacific S Es.; com. also traded Boston & PBW S Es.    ²Indicated rate    ³Primary earns. (based on avge. shs.).    ⁴Incl. excise taxes

STANDARD N.Y.S.E. STOCK REPORTS                    STANDARD & POOR'S CORP.
Reproduction in whole or in part without written permission is strictly prohibited  All rights reserved
Published at Ephrata, Pa. Editorial & Executive Offices, 345 Hudson St., New York, N.Y 10014
Vol. 42, No. 154                    Monday, August 11, 1975                    Sec. 25

ROBERT K. PERKINS
PAINE, WEBBER, JACKSON & CURTIS, INC.
555 SOUTH FLOWER STREET
P. O. BOX 30190, TERMINAL ANNEX
LOS ANGELES, CALIFORNIA 90030
972-3284

## 2284 UNION OIL COMPANY OF CALIFORNIA

### INCOME STATISTICS (Million $) AND PER SHARE ($) DATA

| Year Ended Dec 31 | Gross Oper. Inc. | % Op. Inc. of Gross | Oper. Inc. | Depr. & Dept. | Net bef Taxes | Net Inc. | Earns | Funds Generated | Divs Paid | Price Range | Price Earns Ratios HI LO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1975-- | ---- | ---- | ---- | ---- | ---- | ---- | ---- | 1 48½ | | 50⅞-32½ | ---- |
| 1974-- | 4,419.0 | 21.6 | 953 38 | 436.5 | 488.60 | 288 00 | *8.92 | 23.43 | 1.91 | 56¼-27¼ | 6- 3 |
| 1973-- | 2,552.3 | 20.5 | 523.85 | 268 5 | 260 77 | 180 17 | *5.50 | 16 03 | 1.62½ | 50¼-32½ | 9- 6 |
| 1972-- | 2,098 2 | 21.1 | 443 07 | 249.2 | 183 44 | 121.94 | *3 45 | 13 47 | 1 60 | 41½-27⅞ | 12- 8 |
| 1971-- | 1,981.4 | 21.6 | 428.47 | 260.6 | 161 91 | 114.71 | *3.20 | 12 66 | 1 60 | 42¼-29¾ | 13- 9 |
| 1970-- | 1,811.2 | 22.2 | 401.99 | 229.1 | 153 76 | 114 46 | *3 19 | 11.73 | 1.60 | 39¾-23⅞ | 12- 7 |
| 1969-- | 1,660.1 | 23 3 | 387.64 | 214.3 | 163.85 | 138.85 | *4 08 | 11.98 | 1.50 | 64¼-33¾ | 16- 8 |
| 1968-- | 1,536.0 | 23.0 | 353 37 | 180 4 | 166 43 | 149 83 | *4.50 | 10 97 | 1.40 | 70 -49¾ | 16-11 |
| 1967-- | 1,412 2 | 23.8 | 335 46 | 158 8 | 176 66 | 144 96 | *4 33 | 10 07 | 1.30 | 64 -47½ | 15-11 |
| 1966-- | 1,364.5 | 24.4 | 332 73 | 158.6 | 169 62 | 134 20 | *3 95 | 10 01 | 1 20¾ | 60 -45 | 15-11 |
| 1965-- | 1,234 0 | 23.4 | 288.57 | 139 0 | 142.07 | 112.78 | 3.23 | B 50 | 1.05 | 54½-34½ | 17-11 |

### PERTINENT BALANCE SHEET STATISTICS (Million $)

| Dec. 31 | Gross Prop | Capital Expend. | Cash Items | Inventories | Receivables | Current Assets | Current Liabs | Net Workg Cap. | Cur Ratio Assets to Liabs | Long Term Debt | ($) Book Val. Com Sh. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1974-- | 4,435.37 | 688 11 | 159.2 | 271 7 | 698 0 | 1,148.6 | 752 8 | 395 8 | 1.5-1 | 647 96 | 46.63 |
| 1973-- | 3,906 65 | 390 75 | 104 8 | 150.1 | 535 6 | 825 2 | 468 6 | 356.6 | 1 8-1 | 564 16 | 39 28 |
| 1972-- | 3,700.89 | 314 35 | 140 4 | 149 3 | 412 2 | 717 5 | 382 0 | 335 5 | 1.9-1 | 578.27 | 35 36 |
| 1971-- | 3,568 26 | 283 85 | 95.0 | 149.7 | 355 1 | 614 6 | 356 8 | 257 8 | 1.7-1 | 546.02 | 33.51 |
| 1970-- | 3,449 45 | 245.95 | 54.9 | 144 2 | 367 4 | 583 8 | 351 4 | 232 5 | 1 7-1 | 556 45 | 31 93 |
| 1969-- | 3,345 64 | 413 42 | 58 4 | 146 4 | 347 0 | 568 0 | 390 6 | 177 4 | 1.5-1 | 494 10 | 30.34 |
| 1968-- | 3,038.55 | 519 16 | 120.0 | 117.4 | 329 1 | 587 4 | 294 1 | 293 3 | 2 0-1 | 499 97 | 25 89 |
| 1967-- | 2,659 27 | 279 16 | 175 9 | 116 8 | 298 8 | 608 1 | 260 8 | 347.3 | 2.3-1 | 360 27 | 22 72 |
| 1966-- | 2,539 48 | 258 67 | 161 1 | 108 6 | 261 2 | 555 8 | 272 3 | 283 5 | 2 0-1 | 362 32 | 21.02 |
| 1965-- | 2,395.78 | 208 28 | 128.0 | 123 8 | 213 4 | 487 3 | 222 2 | 265 1 | 2 2-1 | 380.95 | 17 34 |

¹Data for 1973 as originally reported, data for each yr prior to 1973 as taken from subsequent yr.'s Annual Report. ²Excl. excise taxes. ³Incl all property chges ⁴Oil inventories only prior to 1969. ⁵Excl spec cr* of $0 51 a sh. in 1969, $0 29 in 1966 & $0.24 in 1965. ⁶Primary sh earns. (based on avge shs ), fully diluted sh earns were $7 03 in 1974, $4.40 in 1973, $2.98 in 1972, $2.80 in 1971, $2 80 in 1970, $3.40 in 1969, $3 67 in 1968, $3.54 in 1967 & $3 28 in 1966.
*As computed by Standard & Poor's

### Fundamental Position

Union Oil of California, a leading unit on the Pacific Coast, materially expanded its domestic producing and marketing position through the 1965 merger of Pure Oil, an important element in the midwestern and southern petroleum markets. Foreign interests include 87% of Union of Canada and 12½% of Lavan Petroleum (a Persian Gulf producer), production interests in Indonesia, and a North Sea oil find.

Net production of crude oil in 1974 averaged 328,500 barrels daily, including 94,200 barrels daily outside the U. S. (25,300 from Canada), compared with 344,100 barrels daily the prior year. Natural gas production eased to a daily average of 1,539,600 Mcf. from 1,534,100 Mcf. the year before.

As of December 31, 1974, net reserves were estimated at 1,015,000,000 barrels (65% U. S., 9% Canada and 26% other areas), off 5,000,000 barrels from a year earlier, and 7.4 trillion cubic feet of gas, off 4.4%.

Refinery runs averaged 445,700 barrels daily in 1974, against 471,500 barrels daily the year before. Petroleum product sales were equal to 456,000 barrels daily, versus 466,500 barrels daily a year earlier.

Refinery capacity of about 495,000 barrels daily includes two units on the West Coast (219,000), Chicago (152,000), Beaumont, Texas (116,000), and British Columbia (8,000). Union trademark products are distributed through about 1,500 wholesale marketing and 14,147 service stations and other retail outlets in 44 states.

Wholly owned Collier Carbon & Chemical Corp. manufactures chemical fertilizers, industrial chemicals and carbons. Union, through holdings north of San Francisco, is the world's largest producer of geothermal steam.

Paid since 1916, dividends averaged 34% of available net in the five years through 1974.

Employees: 15,364. Shareholders: 113,100.

### Finances

Capital expenditures for 1974 approximated $688 million, up from $391 million a year before. Outlays of about $700 million are now estimated for 1975, a cut from the $750 million previously planned.

The company in June, 1975, sold $150 million of 8.375% debentures due June 1, 1985, in part to help finance the capital program. Previously, $150 million of debentures were sold in November, 1974. Union uses LIFO inventory accounting. The debt equity ratio recently was indicated around 31%.

### CAPITALIZATION

LONG TERM DEBT: $797,517,000, incl. $536,000 4¼% sub. deb. conv. into com. at $23.50 thru June 1, 1976, then higher.

MINORITY INTEREST: $21,302,000.

$2.50 CUM. CONV. PREFERRED STOCK: 7,437,554 shs. (no par); red. at $65; conv. into 1.3 com. shs.

COMMON STOCK: 31,273,400 shs. ($8 1/3 par).

Incorporated in Calif. in 1890 Office—Union Oil Center, 461 South Boylston St., Los Angeles, Calif 90017. Pres—F. L Hartley Secy—R. O. Hedley. Treas—W. R. Craig. Dirs—F. L Hartley (Chrmn), W E Bradley, C S Brinegar, R. A. Burke, R. Di Giorgio, W. H. Doheny, P. C. Hale, R O. Hunt, D. P. Jacobs, W S McConnor, H. T. Mudd, C F. Parker, A. C. Stewart Transfer Agents & Registrars—Manufacturers Hanover Trust Co , NYC, Security Pacific National Bank, Los Angeles.

Information has been obtained from sources believed to be reliable but its accuracy and completeness and that of the opinions based thereon are not guaranteed. Printed in U S A

90

STATEMENT C          STATEMENT OF INCOME FOR THE YEAR

1. Amounts recorded in accounts 412 and 413, Revenue from Utility Plant Leased to Others, will be reported using one of the vertical columns to spread amounts over lines 1 to 19, as appropriate similar to a utility department. These amounts will also be included in columns (c) and (d) totals.

2. Amounts recorded in account 414, Other Utility Operating Income, will be reported in a separate column as prescribed for accounts 412 and 413, above.

3. The space below is provided for important notes regarding the statement of income or any account thereof.

4. Give concise explanations concerning unsettled rate proceedings where a contingency exists that refunds of a material amount may need to be made to the utility's customers or which may result in a material refund to the utility with respect to power or gas purchases. State for each year affected the gross revenues or costs to which the contingency relates and the tax effects together with an explanation of the major factors which affect the rights of the utility to retain such revenues or recover amounts paid with respect to power and gas purchases.

5. Give concise explanations concerning significant amounts of any refunds made or received during the year resulting from settlement of any rate proceeding affecting revenues received or costs incurred for power or gas purchases. State the accounting treatment accorded such refunds and furnish the necessary particulars, including income tax effects, so that corrections of prior income and

| Line No. | Account (a) | Sch. Page No. (b) | TOTAL | | ELECTRIC |
|---|---|---|---|---|---|
| | | | Current year (c) | Increase or (decrease) from preceding year (d) | Current year (e) |
| 1 | UTILITY OPERATING INCOME | | | | |
| 2 | Operating Revenues (400) ...................... | — | $ 346,108,382 | $ 33,355,879 | $ |
| 3 | Operating Expenses: | | | | |
| 4 | Operation Expenses (401) ........................ | — | 252,687,702 | 21,228,096 | |
| 5 | Maintenance Expenses (402) ...................... | — | 6,581,120 | 1,506,687 | |
| 6 | Depreciation Expense (403) ...................... | — | 28,377,471 | 8,739,271 | |
| 7 | Amort. & Depl. of Utility Plant (404*—405)........... | — | 8,760,058 | 8,450,111 | |
| 8 | Amort. of Utility Plant Acq. Adj. (406).............. | — | – | – | |
| 9 | Amort. of Property Losses (407)* .............. | — | – | – | |
| 10 | Amort. of Conversion Expenses (407)* .......... | — | – | – | |
| 11 | Taxes Other Than Income Taxes (408.1).............. | 222 | 6,282,890 | (95,332) | |
| 12 | Income Taxes — Federal (409.1)................... | 222 | 7,950,700 | 1,546,600 | |
| 13 | — Other (409.1)..................... | 222 | 889,500 | 292,825 | |
| 14 | Provision for Deferred Inc. Taxes (410.1)........... | 114, 111 | 7,738,704 | (2,499,406) | |
| 15 | Provision for Deferred Income Taxes—Cr. (411.1) | 114, 111 | ( 5,070,966) | (3,671,486)( | ) |
| 16 | Investment Tax Credit Adj.—Net (411.4)............... | 228-9 | 1,350,000 | 520,800 | |
| 17 | Gains from Disp. of Utility Plant (411.6).... | 224A | ( – ) | 21,951 |( | ) |
| 18 | Losses from Disp. of Utility Plant (411.7)... | 214A | – | – | |
| 19 | Total Utility Operating Expenses.......... | | $ 315,547,179 | $ 36,040,117 | $ |
| 20 | Net Utility Operating Income (carry for- | | | | |
| 21 | ward to page 116-A, line 22)........... | | $ 30,561,203 | $ (2,684,238) | $ |

NOTES TO STATEMENT OF INCOME

See pages 116B through 116D for Notes to Statement of Income.
Page 116 omitted intentionally.

*Accounts 404.1, 404.2, 404.3, 407.1, 407.2 for natural gas companies        Rev.   (12-74)

Annual report of **Texas Gas Transmission Corporation**     Year ended December 31, 1974

## GAS OPERATING REVENUES (Account 400)

1. Report below natural gas operating revenues for each prescribed account, and manufactured gas revenues in total.
2. Natural gas means either natural gas unmixed or any mixture of natural and manufactured gas.
3. Number of customers, cols. (f) and (g), should be reported on the basis of meters, plus number of flat rate accounts, except that where separate meter readings are added for billing purposes more customer should be reported for each group of meters so added. The average number of customers means the average of the twelve figures at the close of each month. If customer count on the residential and commercial classifications includes customers counted more than once because of special services, such as space heating, etc., indicate in a footnote the number of such duplicate customers included in each of the two service classifications.

4. Quantities of natural gas sold should be reported in M.c.f. If billings are on a therm basis, the B.t.u. content of the gas sold should be given, and the sales converted to M.c.f. for the purpose of this report.

5. If increases or decreases from preceding year, columns (c),(e) and (g), are not derived from previously reported figures, explain any inconsistencies.
6. Classification of Commercial and Industrial Sales, Account 481, according to Small (or Commercial) and Large (or Industrial) may be according to the basis of classification regularly used by the respondent if such basis of classification is not greater generally than 200,000 M.c.f. per year or approximately 800 M.c.f. per day of normal requirements. See Account 481 of the Uniform System of Accounts. Explain basis of classification.

Schedule 59

| Line No. (a) | TITLE OF ACCOUNT | OPERATING REVENUES Amount for year (b) | OPERATING REVENUES Incr. or Decr. from preceding year (c) | M.C.F. OF NATURAL GAS SOLD Quantity for year (d) | M.C.F. OF NATURAL GAS SOLD Incr. or Decr. from preceding year (e) | AVG. NO. OF NAT. GAS CUSTRS. PER NO. Number of Customers (f) | AVG. NO. OF NAT. GAS CUSTRS. PER NO. Incr. or Decr. from preceding year (g) |
|---|---|---|---|---|---|---|---|
| | GAS SERVICE REVENUES | | | | | | |
| | 480 Residential sales | | | | | | |
| | 481 Commercial & Industrial sales | | | | | | |
| | Small (or com.) see instr. 6 | 241,738 | 20,916 | 472,595 | (3,282) | 98 | -- |
| | Large (or ind.)see instr. 6 | 3,492,002 | (364,085) | 8,226,497 | (1,814,038) | 5 | -- |
| | 482 Other sales to public authorities | | | | | | |
| | 483 Interdepartmental sales | | | | | | |
| | Total sales to ultimate consumers | 3,733,740 | (343,169) | 8,699,092 | (1,817,320) | 103 | -- |
| | 483 Sales for resale | 336,670,491(1) | 31,022,519 | 701,458,130 | (32,258,581) | 97 | (1) |
| | Total nat. gas service revenues | 340,404,231 | 30,679,350 | 710,157,222 | (34,075,901) | 200 | (1) |
| | Revenues from manufactured gas | | | | | | |
| | Total gas service revenues | 340,404,231 | 30,679,350 | | | | |
| | OTHER OPERATING REVENUES | | | | | | |
| | 487 Forfeited discounts | 1,560 | (475) | | | | |
| | 488 Misc. service revenues | (89) | (86) | | | | |
| | 489 Rev. from trans. of gas of others | 1,594,221 | 51,455 | | | | |
| | 490 Sales of prod. ext. from nat. gas | 265,065 | 73,596 | | | | |
| | 491 Rev. from rent. gas props. by others | 1,561,489 | 300,507 | | | | |
| | 492 Inc. from sale of by-prod. & oil sales | 24,515 | (2,523) | | | | |
| | 495 Rent from gas property | | | | | | |
| | 496 Interdepartmental rents | | | | | | |
| | 495 Other gas revenues | 2,257,390 | 2,254,055 | | | | |
| | Total other operating revenues | 5,704,151 | 2,676,529 | | | | |
| | Total gas operating revenues | 346,108,382 | 33,355,879 | | | | |

Sales by communities (incl. main line sales to resid. and comm. custrs.):

| | | | | |
|---|---|---|---|---|
| Main line industrial sales (incl. main line sales to pub. authorities) | 3,733,740 | 8,699,092 | Rev. | Mcf |
| Sales for resale | 336,670,491 | 701,458,130 | | |
| Other sales to public authorities (from local distribution only) | | | | |
| Interdepartmental sales | | | | |
| Total as above - line 10 columns (b) and (d) | 340,404,231 | 710,157,222 | Rev. | Mcf |

(1) Includes $1,141,618 unbilled curtailment revenue adjustment. See Pages 214 and 522m.

(See Pages 118, Important Charges During Year, for important new territory added and important rate increases or decreases)

Rev (12-69)

## Letter to Stockholders

W. M. Elmer
Chairman of the Board

F. K. Rader
President

We are pleased 'to report that 1974, despite all its well publicized problems in the economic sector, was a successful year for Texas Gas. Our revenues and earnings increased for the fifth consecutive year. The dividend on our common stock was increased for the fourteenth time in the last sixteen years. We ended the year in a most satisfactory liquid condition.

Once again our corporate format of diversified but related interests in energy and transportation served us well, with three of our major divisions showing good to excellent increases — more than offsetting a decline in the remaining division. On the plus side were our Gas Transmission Services, Inland Waterways Services, and Oil and Gas Exploration and Production divisions, with increases in earnings for common and preference shares of 21 percent, 27 percent, and 24 percent, respectively. The Trucking Services division, while still profitable, was down 41 percent.

The details of the 1974 results are examined in the following sections of this report We commend them to your attention, since they provide a framework for considering the posture and progress of Texas Gas.

A few general observations may be in order. The overriding focus in our national economy over the next several years will be on the resource which has made this nation's prosperity in recent years unrivaled in the history of man — energy. In our letter to you last year, we expressed the hope that some of the programs then being discussed by officials in Washington would contribute some solutions to the very serious energy shortage faced by our country. The events of 1974 emphasize the sensitivity of our economy to disruption in energy supplies as well as the financial strain our large energy import needs create. Although no solutions have yet been developed, we must recognize that this is a very complex problem which requires something other than impulsive political decisions. Hopefully, this year's Congress will provide long-range programs to provide the incentives, and will remove the obstacles for the development of domestic energy sources under the American free enterprise economic system. We are optimistic that The Energy Research and Development Administration (ERDA), which came into being in January, 1975, and which is responsible for all Federal funding of energy research and development, is a step forward in accelerating our national energy research efforts.

In late 1974, the Federal Power Commission increased the national rate at which interstate natural gas may be purchased to 50 cents per Mcf. We commend the FPC on this action, but this rate is far below that which will enable Texas Gas to compete for purchase of onshore gas reserves. During 1973 (the most recent period available from a December 1974 FPC report) this country's interstate pipelines delivered 13.7 trillion cubic feet of gas (Tcf). At the prevailing area rates allowed during that period, only 1.1 Tcf were added to these pipelines' reserves from new gas discovered in the lower forty-eight states. During the same period intrastate gas pipelines, which may purchase gas on the basis of its competitive value with other fuels without Federal Government price limitations, were successful in adding almost five times this amount to their reserves

Only a nominal amount of new gas was contracted for by Texas Gas from independent producers during the year. We believe that this situation will continue until a material change occurs in Federal regulatory thinking or in the

form of Federal legislation which will permit the producer of this most valuable product to receive from interstate pipelines a price for gas which is competitive with that of other fuels. Only adequate revenues will permit the producers to carry out the extensive and expensive drilling programs necessary to bring forth the vast amounts of undiscovered gas now underlying the continental U.S.

We are hopeful that Congress acts during 1975 to deregulate new natural gas reserves, in order that the interstate pipelines which supply gas to the bulk of this country's population can have an equal opportunity with intrastate companies to acquire newly discovered reserves.

Despite the restrictions, we are continuing our efforts to secure new reserves for our pipeline system. The Company's greatest asset in adding to its gas supply is its Oil and Gas Exploration and Production division (Exploration), which again experienced a most successful year. Several new oil and gas discoveries were made, with the major portion of its activities devoted to the development of oil and gas discoveries made in late 1973. As a result of continuing success in the development of offshore Texas blocks in which Exploration owns an interest, Texas Gas in midyear filed an application with the FPC to build, on a partnership arrangement with another large transmission company, a major offshore gathering line to bring this gas and other gas, which we are attempting to acquire in the Texas offshore area, to the pipeline system of the Transmission division. At the year-end, the division had arranged for a commitment of the gas of one of Exploration's partners in its Texas offshore area operations, and diligent efforts are being made to add to this supply for the proposed new line.

The expanded drilling program of Exploration in 1974, which also materially increased its oil production, was made possible by substantially increased revenues from the sale of its petroleum products. At the year-end, the Federal Government issued new price regulations reducing the prices that Exploration and many other companies may receive from the sale of propane, butane, and other liquid hydrocarbons, and in turn decreased funds available for the much-needed drilling programs of both Exploration and other producing companies.

The Company is continuing to fund two major programs designed to provide a source of synthetic natural gas. The research project reported in last year's annual report, aimed at developing an economic method of producing hydrogen, substitute natural gas (methane), and other hydrogen-based fuels in conjunction with laser-driven fusion processes, is still being conducted for the Company by the KMS Industries laboratories in Ann Arbor, Michigan. The progress being made on this program, as well as the Company's activities in the coal gasification area, are set forth in the Energy Research section of this report.

Our Inland Waterways division had its best year ever despite a strike at its shipbuilding yard and the effect of coal supply disruption caused by the United Mine Workers' strike. We are extremely optimistic at the potential of our barging operation; it represents the least expensive form of freight transportation available today. The benefits of this low cost transportation are directly realized by every consumer in his consumption of food, energy, and any number of other products.

Our project with Burlington Northern Railroad for barging western coal from a St. Louis terminal, which was announced in 1973, has progressed through much of its planning phase. The success of this project will make western coal available to the areas served by our Inland Waterways system for the generation of electricity on an economical basis.

Our Trucking Services division suffered from the downturn in the economy this year. The reduction in automobile production significantly affected our auto hauling operation (Commercial Carriers, Inc.) during the second half of the year. However, we are pleased that Commercial Carriers was one of the few carriers out of the twenty largest automobile carriers which remained profitable. Terminal Transport, our general commodity carrier, suffered a substantial tonnage reduction during the second half of the year after setting records during the first six months. We are hopeful that major cost reduction programs in this division, coupled with a leveling off of tonnage reductions, will provide a return to acceptable operating results.

We have provided additional information in this report which will be helpful in evaluating past performance, as well as in gauging the course of our future development. In evaluating Texas Gas's operating results and its financial condition, your management strives to maintain the highest possible standards of financial reporting. In all areas of accounting treatment where management has discretion as to the approach, we adopt a policy of responsible conservatism. As in the past, principal focus of our planning continues to be on orderly growth and development of our activities which in our opinion have the greatest potential to our investors, both for the present and particularly for the long term. Our Company's history of increasing dividends is one in which we take pride. As a matter of policy, so long as our earnings continue to increase and your Company's financial position permits, we intend to perpetuate this record.

The excellent results posted by Texas Gas in the unsettled economic context of 1974 demonstrates the basic strength of our corporate structure. We believe that our organization in the fields of energy and transportation places us in a well positioned sector of the economy to serve the needs of our nation in the years ahead. A concerted effort has created a breadth and depth of management talent which reaches through all levels of the organization. Thus, we feel that Texas Gas has the opportunity to continue the growth of the past in the years ahead.

In February, 1975, your Board of Directors reluctantly accepted the resignation from the Board of Mr. Douglas G. Sisterson who has served as one of the Company's directors for a period of eighteen years. We wish to express our appreciation to Mr. Sisterson for these many years of service and loyalty to Texas Gas.

In the final analysis, it is the men and women who are the Corporation that determine its success or failure. For their outstanding performance in 1974, we offer our thanks and the challenge to make 1975 an even better year.

Wm Elmer    F. K. Kader

February 20, 1975

R. O. Koch
Executive Vice President
and Chief Executive Officer

## Gas Transmission Services

The Gas Transmission Services division recorded in proved revenues and earnings in 1974. Revenues of $343.8 million were well above the $311.3 million of the previous year, and earnings available for common and preference shares of $19.7 million were 21 percent ahead of the $16.3 million reported in 1973. These results reflect a rate increase which became effective April 1, 1974, providing for recovery of sharply higher costs which had been hampering results for the last three quarters of 1973 and the first quarter of 1974.

Revenues in this division are principally derived from the sale of natural gas, primarily to distribution utilities, and the transportation of gas owned by others. In 1974, our sales and transportation volumes were 737 billion cubic feet, some 4 percent below the 769 billion recorded in 1973. Due to factors which are discussed later, this downward volume trend is expected to continue. However, this expected volume decline will not necessarily result in reduced earnings for this division. Present Federal Power Commission rate-making regulations result in rates which cover a gas pipeline company's total costs for gas purchases and operating expenses, and a return on all capital invested in its pipeline facilities. Thus, a pipeline company's earnings are determined from the common equity investment necessary to serve its customers, rather than from volume flow-through. This rate-making philosophy is expected to continue, since it is necessary to maintain the financial viability required by the individual pipeline to serve its customers.

Texas Gas put into effect on April 1, 1974, a rate increase totaling $20 million. This increase included a return on the Company's equity of 11.6 percent. It was the first general rate increase made by the Company since 1972, and was the result of both higher costs and a five percent curtailment of gas volumes implemented in 1974.

Additional cost increases and further volume curtailments necessitated the filing on September 30, 1974, of a new rate increase application which is scheduled to become effective April 1,1975. This filing requested a return of 13 percent on equity. The September 30,1974, filing was based on the Company increasing its curtailment of gas deliveries to 15 percent. In January, 1975, due to unpredictable declines in deliverability from our various supply sources, we informed our gas distribution customers that this planned curtailment must be deepened to 18.6 percent of annual customer entitlements. Much of this deliverability decline was due to well damage in the Gulf of Mexico sustained in connection with Hurricane Carmen. Every attempt will be made to incorporate the effect of this additional curtailment in the rates to become effective April 1, 1975.

The continuing challenge of this division is maintaining an adequate level of gas supply. In 1974, the Company sold 696 billion cubic feet of gas to its customers and used an additional 30 billion in operating the pipeline system. Of these requirements, 77 percent were obtained from independent producers, including the Oil and Gas Exploration and Production division, and 23 percent from three other pipeline companies, under long-term contracts. At year-end 1974, independent engineers estimate that Texas Gas had available a total of 7 trillion cubic feet of natural gas in field sources, gas in storage, and under contracts with pipeline suppliers.

| | enues | | Net Income Available for Common and Preference | | Capital Additions |
|---|---|---|---|---|---|
| | Amount | Percent of Total | Amount | Percent of Total | |
| 1974 | $343,791,000 | 49.6% | $19,729,000 | 45 4% | $21,100,000 |
| 1973 | $311,319,000 | 52 7% | $16,339,000 | 42.4% | $17,209,029 |

Texas Gas and its pipeline suppliers are continuing to attack vigorously the problem of gas supply. Intensive exploratory efforts are under way to develop new reserves, both onshore in the Gulf Coast area and offshore in the Gulf of Mexico. Our own efforts are being carried out by Texas Gas Exploration Corporation, which currently provides 5 percent of our total system requirements. We believe that the greatest potentials for new gas for our pipeline system lie in offshore Louisiana and Texas, and are focusing our efforts on these areas. The discoveries made in 1974 on our offshore acreage are detailed in the Oil and Gas Exploration and Production section of this report.

As a result of gas discoveries in 1974 in the area offshore Texas, the Company and Michigan Wisconsin Pipe Line Company have filed a joint application with the Federal Power Commission seeking approval for the construction of a pipeline system to connect a portion of these new supplies. The main gathering system would include 177 miles of line and related compression facilities, with construction cost estimated at $217 million. Construction is planned to begin in 1976. The extent of Company-owned reserves and those contracted for from others will not be known until extensive development drilling is completed, but we are confident that they will be substantial. With the availability of this offshore pipeline facility, coupled with our intensive efforts to secure additional reserves in this area, we are optimistic that a significant new system supply will result.

The prospects for near-term additions to pipeline system supply from onshore discoveries, however, continue to be dim due to the wide disparity between free market intra-state prices, recently quoted at up to $2.00 per thousand cubic feet, and the Federally regulated interstate rate, set at 50 cents in 1974. Until this disparity is corrected, we will be unable to buy any significant onshore gas supplies.

We are actively pursuing synthetic gas alternatives as a means of bolstering system supply. Our research efforts in the areas of the gasification of coal and the synthesization of methane utilizing nuclear fusion energy are covered in the Energy Research section of this report. We are hopeful that the technology necessary to make these processes scientifically and economically viable will be perfected in the next five years so that synthetic gas from one or both of these processes is available to our system in the 1980's. The project mentioned in last year's annual report of producing gas from imported petroleum has been shelved due to the inability to secure a reliable source of foreign feedstock.

Capital expenditures totaled $21 million in 1974. These included substantial work on our Midland storage field and pipeline replacements, an aerial river crossing, and normal construction. Expenditures for plant and equipment in 1975 for this division are estimated at $34 million, principally for gathering lines, storage facilities, and normal pipeline replacements.

### CERTIFICATE OF SERVICE BY MAIL

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES } ss.

WALTER H. YOUNG hereby certifies:

(1) That his name is WALTER H. YOUNG, and his business address is 606 South Olive Street, Suite 2104, Los Angeles, California 90014; that he is an active member of the State Bar of California, and has been admitted to practice before the United States District Court; that he is not a party to the cause entitled upon the document to which this Certificate is affixed.

(2) That he served a copy of the foregoing document, entitled SUPPLEMENTAL DECLARATION OF WALTER H. YOUNG RE MOTION UNDER SECTION 28 U. S. CODE SECTION U. S. CODE SECTION 455 upon the following named persons by causing an envelope to be addressed as follows, a copy of the foregoing document to be enclosed and sealed therein and the envelope to be deposited in the United States mail, with postage thereon fully prepaid, at Sixth and Olive Streets, Los Angeles, California, on November 12th, 1975:

> McCUTCHEN, DOYLE, BROWN & ENERSEN
> William W. Schwarzer
> James L. Hunt
> Lynn H. Pasahow
> Attorneys at Law
> 601 California Street
> San Francisco, California 94108

I certify and declare under penalties of perjury that the foregoing is true and correct.

Executed at Los Angeles, California, this 12th day of November.

(s) Walter H. Young
WALTER H. YOUNG

Subscribed and sworn to before me this 12th day of November, 1975.

(s) Adeline M. Young
Adeline M. Young, Notary Public

### APPENDIX B

### POINTS AND AUTHORITIES IN SUPPORT OF REQUEST TO HON. A. ANDREW HAUK, JUDGE, TO EXCUSE HIMSELF FROM THE TRIAL OF THIS ACTION

### PRELIMINARY STATEMENT

On October 28, 1975, WALTER H. YOUNG filed with this Court a request to HON. A. ANDREW HAUK, Judge, to excuse himself from the trial of this action.

Thereafter, on the Court's own motion, the said request was set for hearing on November 17, 1975, at 10:00 a. m. As of the time of dictating these points and authorities, declarant has received no responsive papers from the defendant.

The basis of plaintiff's request is pursuant to Section 455, Title 28 U. S. Code Annotated. The ground of the request is that the real party in interest in this case, to wit, Texas Gas Transmission, is a partner and joint venturer with Union Oil Company of California, a corporation in which Hon. A. Andrew Hauk, Judge, holds a substantial stock interest.

The actual defendant in the case is Commercial Carriers, Inc., a wholly-owned subsidiary of Texas Gas Transmission. The request recited that the ownership of the defendant by Texas Gas Transmission and the association of said corporation as a partner and joint venturer with Union Oil Company may not be known to Hon. A. Andrew Hauk, and plaintiff was calling these matters to the attention of the Court, together with the fact that defendant's counsel have on many occasions declared and predicted that the Hon. A. Andrew Hauk would rule in their favor on particular matters, and would in the future rule in their favor on matters connected with this cause.

## NATURE OF SECTION

Effective December 4, 1974, Title 28, Section 455, the United States Code was amended to apply to the trial of any proceeding that would commence after that date. The section is entitled "Disqualification of Judges".

This section makes it mandatory that a judge disqualify himself if he knows that he has a financial interest, or any other interest that could be substantially affected by the outcome of the proceeding.

The general basis of the motion is that Hon. A. Andrew Hauk, Judge, heretofore publicly excused himself in a pending case in which he declared he had a substantial interest in Union Oil Company of California. A newspaper article that dealt with that subject at or about the time of the decision is hereto attached. The cases hold that being related to a partner in a partnership constitutes relationship to a party to the proceeding. Since Union Oil and Texas Gas Transmission are partners and joint venturers in various oil and gas matters in Louisiana and the Gulf of Mexico, a relationship of one partner constitutes a relationship with both partners, according to the cases hereinafter cited.

As an additional premise, Union Oil Company sells a great amount of natural gas to Texas Gas Transmission, running into many million of dollars, so that there is a direct pecuniary relationship between the two, and since this lawsuit involves the business of two and a half million dollars, the sale of which is involved with respective damage claims of three million dollars, the outcome of the litigation could have a substantial affect on Texas Gas Transmission in its relationship with Union Oil Company, as a customer, partner, and joint venturer.

## IS RELATIONSHIP TO A PARTNER DIFFERENT THAN RELATIONSHIP TO A CORPORATION?

We have made diligent search on this question in Corpus Juris Secundum, the American Dissenial System, and A.L.R., and there are only two cases dealing with partnership:

*Grubstake Inv. Ass'n v. Kirkham*, 10 South Western Reporter 2d, 184

and

*Stephenson, et al. v. Kirkham*, 297 S.W. 265

photostatic copies of which are attached.

These cases recite that it is immaterial whether the partner is named in the pleading or not if there is a relationship to the partner (such as a judge owning stock in a corporation that is a partner). It is immaterial whether the partner is not named in the pleadings. Therefore, it is immaterial that Union Oil Company is not a party to the case. In this case, the court said:

> "It has never been held that a judge would not be disqualified in trying a partnership case when a near relative of his is one of the partners."

In the *Stephenson v. Kirkham* case, the court pointed out that in the case of partnership ventures, each partner is directly affected by the relationship between the partners.

## WHAT CONSTITUTES AN INTEREST?

In the case of In re *Honolulu Consolidated Oil Co.*, 243 Fed. 348. there were seventeen oil companies that had individual and joint interests in land, and suits were brought against them by the United States Government. The trial judge had stock in one company, but that company was not a defendant or a party to the lawsuit that was pending before him, so we therefore had a situation where a judge owns stock in an oil company that was not a party to the lawsuit, but was associated with other companies that were involved in the litigation.

In the *Honolulu Consolidated Oil Co.* case, the defendant's attorney did as I did in this case, and made a suggestion to the judge that the judge disqualify himself, which he refused to do, the suggestion being made in writing and supported by an affidavit. In that case, the moving party sent a copy to the senior circuit judge, as I did in our case. The amount of stock owned by the judge had been purchased by him for $300.00, and the judge denied any bias or prejudice. The court nevertheless held that the judge had an interest in the pending suit by reason of the possibility of the stockholders' liability, and to his ownership of 2,250 shares. The court said:

> "Whenever it appears that the judge of any district court is in any way concerned in interest, it shall be his duty on application by either party to cause the fact to be entered on the record and excuse himself from the case."

It should be noted that this is a Ninth Circuit Case, and they relied on the case of *Meyer v. City of San Diego*, 121 Cal. 102, which stated that the California rule is that a judge is disqualified in any litigation where he has any pecuniary interest which would be directly affected by the judgment.

The case of *Meyer v. City of San Diego* involved a suit by the City of Marysville against a dredging company, and the trial judge owned a lot in Yuba City on the Feather River. Even though the judge was not related to any of the parties, it was felt that the effect of the litigation might have some affect on his lot, and he was therefore disqualified, and a writ of mandate was ordered to be issued.

There is a California case, *Adams v. Minor*, 121 Cal. 372, which holds that a judge must disqualify himself if he holds stock in a corporation holding property which is involved in the litigation. Quoting from *Adams v. Minor*, page 374, the court said:

> "It was held by Chancellor Sanford in *Washington Ins. Co., v. Price*, 1 Hopk.Ch. 1, that a chancellor being a stockholder in a corporation cannot do any judicial act in a cause in which that corporation is a party, although he is not personally a party to the record.

> "We can see no substantial difference in the case of a judge who is a stockholder in a corporation sitting in a case brought by or against such corporation, and a case where the matter in controversy involves the property of such corporation although it is not a party to the action."

We have run this case in Shepard's, and it is still good law.

We also wish to point out that the relationship of Union Oil Company to Texas Gas Transmission, being one of partners and joint venturers, in fact makes Union Oil Company an indirect party to this action.

In the case of *Adams v. Minor*, it was a situation where a judge owned stock in a bank. The bank was not a party to the action. The bank, however, was involved financially with an irrigation district that was a party to the action. Therefore, even though the bank was not a party to the action, the relationship between the bank and the irrigation district was the relationship that disqualified the judge because he owned stock in the bank.

## FUNCTION OF WRIT OF MANDAMUS

It will be noted that in the *Honolulu Consolidated Oil Co.* case, the court issued a writ of mandate, directing the judge to set forth his interest on the record and excuse himself from the case.

There is an article in 45 A.L.R.2d, 930, as to whether there is any appeal or right to apply for writ of mandate or right to apply for writ of prohibition insofar as proceedings had in connection with the disqualification of the judge on the ground of interest. That article points out that the Second, Fourth, and Eighth Districts have ruled on this subject, affirming that the remedy is either writ of mandate,

to require the judge to disqualify himself, or a writ of prohibition, to prohibit proceedings with the trial.

In the supplement to this A.L.R. Section, reference is made that the Ninth Circuit now likewise follows the rule that writ of mandate and writ of prohibition are the alternative proper remedies rather than an appeal, referring to *Gladstein v. McLaughlin*, 230 Fed.2d, 762.

## ARGUMENT

The supplemental declaration of Walter H. Young reveals that the extract from the Interstate Commerce Commission, order of September 25, 1974, reflects that Texas Gas Transmission will provide the funds whereby Commercial Carriers, Inc. will purchase Robertson Truck-A-Ways. By virtue of additions to equipment, etc., these funds will amount to almost five million dollars, which will come directly from the Gas & Oil Division of Texas Gas Transmission.

That same Gas & Oil Division, according to the financial report of TGX (Texas Gas Transmission) produce only 5% of its own gas needs. The gas needs produced almost $340,000,000 of income for Texas Gas Transmission, 5% of which would be only $17,000,000, leaving $323,000,000 produced from gas obtained through other suppliers, and since there are only two other principal suppliers, of which Union Oil Company is one, Union Oil must be supplying tens of millions of dollars of natural gas to Texas Gas Transmission.

It is apparent that partnership ventures with Texas Gas Exploration involve risks as well as possible gains, as evidenced by Texas Gas financial report commenting on the great damage done in 1974 by a hurricane. Furthermore, since only one out of forty or fifty oil wells drilled is productive, the risks of exploration and joint ventures are great. The fact that Texas Gas Transmission has advanced almost $35,000,000 to Texas Gas Exploration for exploration purposes reflects substantial risks in any partnership for oil exploration. It therefore follows that since Texas Gas Transmission owns Commercial Carriers, Inc. and is supplying the money with which Commercial Carriers hopes to buy Robertson Truck-A-Ways, it is apparent that the purchase price of Robertson is coming directly out of the oil and gas activities of Texas Gas Transmission. This company is a partner with Union Oil Company in ventures of great magnitude. The success or failure of those ventures could well affect both the value and the dividends of Union Oil Company stock.

The newspaper article in the "Times", of December 3, 1974, quotes Judge Hauk as stating that he owns a substantial amount of stock in Union Oil Company which has an interest in off-shore oil drilling, Judge Hauk declaring that his dividends from Union Oil were a sufficient financial interest. According to the newspaper article, Hon. A. Andrew Hauk, Judge, considered his disqualification to be required under the new code section, and based it on the dividends he might receive from his Union Oil stock. The same principle applies

in our case. The dividends paid by Union Oil stock are substantially affected by its natural gas transactions with Texas Gas Transmission and also by the risks of gain or loss resulting from its joint ventures with Texas Gas Transmission, who is providing the money for the proposed purchase from Mr. Mavis by Commercial Carriers, Inc.

Dated: November 12, 1975.

Respectfully submitted,

(s) Walter H. Young
WALTER H. YOUNG

## CERTIFICATE OF SERVICE BY MAIL

WALTER H. YOUNG hereby certifies:

(1) That his name is Walter H. Young, and his business address is 606 S. Olive St., Suite 2104, Los Angeles, California 90014; that he is an active member of the State Bar of California, and has been admitted to practice before the United States District Court; that he is not a party to the cause entitled upon the document to which this certificate is affixed.

(2) That he served a copy of the foregoing document, entitled POINTS AND AUTHORITIES IN SUPPORT OF REQUEST TO HON. A. ANDREW HAUK, JUDGE, TO EXCUSE HIMSELF FROM THE TRIAL OF THIS ACTION, upon the following named persons by causing an envelope to be addressed thereto as follows containing a copy of the foregoing document, and said envelope to be deposited in the United States mail, with postage thereon fully prepaid, at Sixth and Olive Streets, Los Angeles, California, on November 12, 1975:

McCUTCHEN, DOYLE, BROWN & ENERSEN
William W. Schwarzer,
James L. Hunt,
Lynn H. Pasahow
Attorneys at Law
601 California Street
San Francisco, California 94108

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Los Angeles, California, this 12th day of November, 1975.

(s) Walter H. Young
WALTER H. YOUNG

Subscribed and sworn to before me
this 12th day of November, 1975.

(s) Adeline M. Young
ADELINE M. YOUNG
Notary Public in and for said
county and state

**20** Part I—Tues., Dec. 3, 1974 **Los Angeles Times**

# State Senate's Rules Panel in Big Shakeup

**Continued from Third Page**

decisions were made behind guarded doors in party caucuses, and the public sessions of each house were reserved for opening day ceremony.

In the Assembly, liberal Willie L. Brown Jr. (D-San Francisco) pieced together an unlikely coalition of all 25 Republicans and his remaining Democratic supporters in a desperate attempt oust McCarthy as Speaker. McCarthy had defeated Brown for California's second most powerful political office last June.

But during a two-hour caucus, 42 of the 54 Democrats voted to support McCarthy. Twelve abstained. The caucus also voted 36 to 12 with six abstentions —the bare two-thirds majority required—to cast all Democratic votes on the floor for McCarthy.

The floor vote wound up 53 Democrats for McCarthy, 24 Republicans for Minority Leader Robert G. Beverly (Re-Redondo Beach) and one by maverick Ken Meade (D-Oakland) for John Vasconcellos (D-Campbell).

McCarthy condemned Brown's attempt to be elected Speaker with a majority of Republican votes and a minority of Democratic support as "a sickening spectacle."

"I am astonished that any man's ego could be so consuming to allow himself to drown in his own self pity," McCarthy told newsmen.

## DEVICE

**Continued from Third Page**

six-county South Coast Air Basin. He wants to limit mandatory installation to

Brown, who had promised Republicans at least five committee chairmanships, replied that McCarthy used GOP support initially to win the speakership in June. McCarthy, however, was supported at that time by a majority of Democrats.

Elected speaker pro tem, the Assembly's second highest post, was McCarthy ally Louis J. Papan (D-Daly City). The vote was 74 to 0.

Elected to the Assembly Rules Committee were McCarthy allies Joseph B. Montoya (D-La Puente), Ken MacDonald (D-Ventura) and Pauline Davis (D-Portola), and Republicans Eugene A. Chappie (Roseville), Ernest N. Mobley (Fresno) and Robert H. Burke (Huntington Beach). Leon Ralph (D-Los Angeles) was chosen by McCarthy as Rules Committee chairman

Democrats control the Assembly 54 to 25 with one vacancy and the Senate 25 to 14 with one vacancy.

In the Senate, the key vote in the Democratic caucus came on a motion to delay the Rules Committee decision until after balloting on pro tem. The motion failed on an 11-11 standoff.

This forced Zenovich to decide whether to run for his old seat on the Rules Committee or go for broke and bid for pro tem, a job he had been jockeying to obtain for a year. He went for broke.

Petris and incumbent Joseph M. Kennick (D-Long Beach) were unanimously selected for the Democrats' two seats on the Rules Committee.

Zenovich then nominated himself as the Democratic candidate for pro tem and was defeated 18 to 6 by Mills, who later

# Judge Takes Self Off Case, Cites Oil Stock

**BY NARDA TROUT**
*Times Staff Writer*

A Los Angeles federal judge, citing his ownership of Union Oil Co. stock, Monday disqualified himself from hearing arguments in a lawsuit to postpone the leasing of offshore oil-drilling sites.

U.S. Dist. Judge A. Andrew Hauk said he owns a "substantial amount" of Union Oil stock which he obtained through a stock option when he represented the oil firm when he was in private practice during 1952 to 1964.

And Union Oil Co. has an interest in offshore oil drilling, he said.

He noted a new law passed by Congress in late November which prohibits federal judges from ruling in cases where they might have a friendship or financial interest with the parties involved.

"I get dividends out of that (Union) stock and I think that's a financial interest," Hauk said.

The suit was filed in August by state Atty. Gen. Evelle Younger and the Coastal Conservation Commission against the U.S. Department of the Interior and Interior Secretary Rogers C. B. Morton. It seeks to prevent the Interior Department from continuing with procedures leading to the leasing of offshore oil drilling sites before completion of an environmental impact study.

Monday Hauk was to hear three motions in the case, one from the Western Oil and Gas Assn., a trade organization of oil firms, seeking to become a party to the suit.

Hauk indicated Union Oil Co. is a member of the association. "Union leases offshore and would undoubtedly go to auction when the environmental impact statement is finalized," Hauk said.

Hauk referred the case back to the court clerk's office The matter was transferred to U.S. Dist. Judge David W. Williams, who scheduled the motions to be heard Jan. 6 at 9 a.m.

In addition to the Western Oil and Gas Assn. motion, Williams will rule on a U.S. government motion for summary judgment and a state's cross-motion for summary judgment or a preliminary injunction.

## FAMILIES

**Continued from Third Page**

woman among the newcomers, the television cameras often were trained on her family, a experience that can make some persons nervous and self conscious.

Although the day belonged mostly to the newcomers, some others received attention too. P. I. Kenealy, 81, officially retired as sergeant at arm of the Senate on Sunday but was on hand Monday to shake a few hands.

After 25 years in the Legislature, will he miss it?

"I've been here long enough," he replied.

ADVERTISEMENT
**JAPANESE HEARING AID**

The sensational Japanese four-transistor hearing aid truly an engineering triumph and a value miracle is now available at only 69.95 with a full year's written guarantee. For demonstration see George Waterman, Roosevelt Bldg. 727 W. 7th St., corner Figuer, Los Angeles 90017

The University of West Los Angeles
**SCHOOL OF LAW**

ACCREDITED PROVISIONALLY

**REGISTRATION AND ENROLLMENT OPEN FOR SPRING SEMESTER.**

SESSION STARTS JAN. 20, 1975

- J.D. Degree
- Approved for Veterans
- Day or evening classes

Call or Write For Bulletin U.W.L.A.
11000 Washington Blvd.
Culver City, Calif. 92233
Ph. 835 3455

If you don't use perfume or men's cologne

**Sherrell faith most famous in fragrances at ha**

upon which it becomes effective; except that the expiration of this Act shall not affect the status of any project approved prior to the date of such expiration.

Approved Dec. 5, 1974.

## EMERGENCY PETROLEUM ALLOCATION ACT —EXTENSION

### PUBLIC LAW 93–511; 88 STAT. 1608

[H. R. 16757]

An Act to extend the Emergency Petroleum Allocation Act of 1973 until August 31, 1975.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That:*

Section 4(g)(1) of the Emergency Petroleum Allocation Act of 1973 [70] is amended by striking out "February 28, 1975" wherever it appears, and inserting in lieu thereof "August 31, 1975".

Approved Dec. 5, 1974.

## JUDICIARY—DISQUALIFICATION OF JUDGES

*For Legislative History of Act, see p. 6351*

### PUBLIC LAW 93–512; 88 STAT. 1609

[S. 1064]

An Act to improve judicial machinery by amending title 28, United States Code, to broaden and clarify the grounds for judicial disqualification.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That:*

Section 455 of title 28, United States Code,[71] is amended to read as follows:

"§ 455.  **Disqualification of justice, judge, magistrate, or referee in bankruptcy**

"(a) Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

"(b) He shall also disqualify himself in the following circumstances:

"(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

"(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it;

70.  1973 U.S.Code Cong. & Adm.News, page 693.    71.  28 U.S.C.A. § 455.

"(3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy;

"(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

"(5) IIe or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

"(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

"(ii) Is acting as a lawyer in the proceeding;

"(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

"(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

"(c) A judge should inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

"(d) For the purposes of this section the following words or phrases shall have the meaning indicated:

"(1) 'proceeding' includes pretrial, trial, appellate review, or other stages of litigation;

"(2) the degree of relationship is calculated according to the civil law system;

"(3) 'fiduciary' includes such relationships as executor, administrator, trustee, and guardian;

"(4) 'financial interest' means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

"(i) Ownership in a mutual or common investment fund that holds securities is not a 'financial interest' in such securities unless the judge participates in the management of the fund;

"(ii) An office in an educational, religious, charitable, fraternal, or civic organization is not a 'financial interest' in securities held by the organization;

"(iii) The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a 'financial interest' in the organization only if the outcome of the proceeding could substantially affect the value of the interest;

"(iv) Ownership of government securities is a 'financial interest' in the issuer only if the outcome of the proceeding could substantially affect the value of the securities.

"(e) No justice, judge, magistrate, or referee in bankruptcy shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification."

Sec. 2.   Item 455 in the analysis of chapter 21 of such title 28 is amended to read as follows: "Disqualification of justice, judge, magistrate, or referee in bankruptcy.".

Sec. 3.   This Act shall not apply to the trial of any proceeding commenced prior to the date of this Act, nor to appellate review of any proceeding which was fully submitted to the reviewing court prior to the date of this Act.

Approved Dec. 5, 1974.

## NUCLEAR INCIDENTS—COMPENSATION FOR DAMAGES—U. S. WARSHIPS

*For Legislative History of Act, see p. 6363*

### PUBLIC LAW 93–513;  88 STAT. 1610

[S. J. Res. 248]

Joint Resolution assuring compensation for damages caused by nuclear incidents involving the nuclear reactor of a United States warship.

Whereas it is vital to the national security to facilitate the ready acceptability of United States nuclear powered warships into friendly foreign ports and harbors; and

Whereas the advent of nuclear reactors has led to various efforts throughout the world to develop an appropriate legal regime for compensating those who sustain damages in the event there should be an incident involving the operation of nuclear reactors; and

Whereas the United States has been exercising leadership in developing legislative measures designed to assure prompt and equitable compensation in the event a nuclear incident should arise out of the operation of a nuclear reactor by the United States as is evidenced in particular by section 170 of the Atomic Energy Act of 1954, as amended; and

Whereas some form of assurance as to the prompt availability of compensation for damage in the unlikely event of a nuclear incident involving the nuclear reactor of a United States warship would, in conjunction with the unparalleled safety record that has been achieved by United States nuclear powered warships in their operation throughout the world, further the effectiveness of such warships:  Now, therefore, be it

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That:*

It is the policy of the United States that it will pay claims or judgments for bodily injury, death, or damage to or loss of real or personal property proven to have resulted from a nuclear incident involving the nuclear reactor of a United States warship: *Provided,* That the injury, death, damage, or loss was not caused by the act of an armed force engaged in combat or as a result of civil insurrection.  The President may authorize, under such terms and conditions as he may direct, the payment of such claims or judgments from

any contingency funds available to the Government or may certify such claims or judgments to the Congress for appropriation of the necessary funds.

Approved Dec. 6, 1974.

## NUCLEAR INFORMATION—REPORTS TO CONGRESS

*For Legislative History of Act, see p. 6370*

### PUBLIC LAW 93–514; 88 STAT. 1611

[S. 3802]

An Act to provide available nuclear information to committees and Members of Congress.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That:*

Section 202 of the Atomic Energy Act of 1954 is amended by designating the present text subsection "a." and by adding the following as subsection "b.":

"b. The members of the Joint Committee who are Members of the Senate and the members of the Joint Committee who are Members of the House of Representatives shall, on or before June 30 of each year, report to their respective Houses on the development, use, and control of nuclear energy for the common defense and security and for peaceful purposes. Each report shall provide facts and information available to the Joint Committee concerning nuclear energy which will assist the appropriate committees of the Congress and individual members in the exercise of informed judgment on matters of weaponry; foreign policy; defense; international trade; and in respect to the expenditure and appropriation of Government revenues. Each report shall be presented formally under circumstances which provide for clarification and discussion by the Senate and the House of Representatives. In recognition of the need for public understanding, presentations of the reports shall be made to the maximum extent possible in open sessions and by means of unclassified written materials.".

Approved Dec. 6, 1974.

I

## PRELIMINARY STATEMENT

Twenty days before the scheduled pretrial conference in this matter, plaintiff and counterdefendants filed this motion to disqualify Judge A. Andrew Hauk and reassign this matter to another judge. The motion is made pursuant to 28 U.S.C. § 455 on the grounds that: (1) Union Oil of California ("Union Oil"), a corporation in which Judge Hauk has a financial interest, has certain financial dealings with Texas Gas Transmission Corporation ("Texas Gas Transmission"), the parent corporation of Commercial Carriers, Inc.[1]; and, (2) Commercial Carriers' counsel have on occasion indicated to counsel for plaintiff and counterdefendants that positions taken by him are wholly contrary to governing law, and if pursued, would be rejected by the court. When these matters have been presented to the court, the court has recognized the clear lack of merit in the positions taken by plaintiff and counterdefendants, and in accordance with the governing law, the court has ruled against them.

II

## THERE IS, AND CAN BE, NO SHOWING THAT BUSINESS DEALINGS BETWEEN TEXAS GAS TRANSMISSION AND UNION OIL REQUIRE DISQUALIFICATION OF THE TRIAL JUDGE

In 1974 section 455 of the Judicial Code, which governs disqualification of judges, was substantially amended by Congress. In doing so Congress expressly sought to replace the vagueness of prior section 455 with definite, objective standards. See *House Report No. 93–1453*, 93d Cong., 2d Sess. (1974), *quoted in 1974–3 U.S.Code Cong. & Ad.News* 6351, 6354–55. This was done in order to preclude litigants from challenging impartiality when actually the litigant fears an adverse decision:

> "[I]n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but

---

1. In actuality, Commercial Carriers, Inc. is a wholly-owned subsidiary of American Commercial Lines, which is, in turn, wholly owned by Texas Gas Transmission.

they are not entitled to judges of their own choice." *Id.*, 1974–3 *U.S.Code Cong. & Adm.News* at 6355 (emphasis in original).

In order to achieve this goal of an objective standard, Congress very carefully defined the type of personal interest in a case that requires disqualification. In that regard, subsection 455(b)(4) provides that:

> "[The judge shall disqualify himself where] [h]e knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."

The central term, "financial interest" is specifically defined in subsection 455(d)(4):

> " '[F]inancial interest' means ownership of a legal or equitable interest, however small, or a relationship as director, advisor, or other active participant in the affairs of a party . . . . ' "

It is clear that any business relationship between Union Oil and Texas Gas Transmission can, in no way, turn a stock ownership in Union Oil into a "financial interest" or other interest such as would require disqualification pursuant to section 455(b)(4). There is no indication whatsoever that Judge Hauk has "ownership of either a legal or equitable interest" in either the "subject matter" of this case or any "party to the proceeding." Moreover, there is no indication that any interest of Judge Hauk in Union Oil "could be *substantially* affected by the outcome" of this suit (emphasis added). To the contrary, it is only claimed that the parent corporation of a party to this suit is involved in some contracts with Union Oil involving commercial ventures wholly unrelated both to this suit and to Commercial Carriers. No theoretical chain of events is suggested as to how the outcome of this case could affect even Union Oil, much less "substantially" affect the shareholders of Union Oil.

Because even the worst claims of plaintiff and counterdefendants concerning Union Oil's contracts with Texas Gas Transmission do not warrant disqualification under the statutory standards, no inquiry into those contracts should be necessary. Commercial Carriers counsel, however, have inquired of Texas Gas Transmission, a nonparty, as to the details of the contracts between it and Union Oil, and will forward to the Court affidavits explaining the nature of those contracts at the earliest opportunity.[2]

---

2. Commercial Carriers had sought to obtain the information early enough to include it with this response, and had delayed filing the response for that purpose. In spite of due diligence, however, Texas Gas Transmission has been unable to supply reasonably detailed information concerning its business dealings, and those of the Texas Gas Exploration subsidiary, with Union Oil on such notice. (See Affidavit of J. L. Hunt attached)

### III

## STATEMENTS OF DEFENDANT'S COUNSEL DO NOT JUSTIFY DISQUALIFICATION OF THE TRIAL JUDGE

Whatever the court's conclusion concerning the propriety of disqualification based upon financial interest, it is patently clear that the comments of Commercial Carriers' counsel do not justify disqualification. In fact, this appears to be simply another—the third —of a series of attacks on the perseverence, the competence, and indeed, the integrity of Commercial Carriers' counsel. First, plaintiff moved to disqualify Commercial Carriers' counsel for breaching ethical considerations precluding representation of a party in opposition to a prior client.[3] This motion was rejected by the court after Commercial Carriers demonstrated that its counsel had never represented Mr. Mavis. Plaintiff and counterclaimants next sought to preclude Commercial Carriers from completing its legitimate discovery, in part, by accusing its counsel of perjury.[4] This claim was disproved by various records of this court and correspondence of counsel, and the court allowed the discovery. Now, quoting statements out of context, plaintiff and counterdefendants apparently seek to charge Commercial Carriers with either improper communications with or improper influence upon the court. This claim, made only by innuendo, has absolutely no basis in fact.

It is a fact that Commercial Carriers' counsel have, during the course of this litigation, expressed confidence in the legal position of their client. It has been and continues to be their position that plaintiff has sought by various means to avoid his clear and legally binding contractual obligations, and that in doing so, he has passed far into the zone of tortious conduct. Moreover, it is and has been the view of Commercial Carriers' counsel that throughout discovery in this matter plaintiff and counterdefendants have consistently sought to avoid a full and fair inquiry that would disclose the truth concerning the claims and counterclaims made in this matter. Whether the case is tried to judge or jury, and plaintiff is presently requesting a jury, Commercial Carriers continues to have confidence that when the evidence is in, its position will be sustained. Such confidence, however, imputes or implies no bias or interest to the trial court.

It is likewise true that Commercial Carriers has pointed out to counsel that the legal positions taken by him in the numerous motions he has filed in the case were contrary to applicable law, and would be denied. It is not, and should not be, surprising that each such motion has been denied.

3. Motion to Disqualify Silver, Rosen, Fischer & Stecher and Martin J. Rosen, filed December 4, 1974, denied by Order, January 27, 1975.

4. Affidavit of Walter H. Young in Opposition to Continuance of Pre-Trial, filed September 10, 1975, continuance granted by Order, September 23, 1975.

Finally, it has frequently occurred during depositions in this matter that conduct of opposing counsel has so inhibited relevant interrogation that it seemed the only recourse was to place the matter before the Court. On those occasions, we have so stated, usually with little effect. Such statements are not uncommon in contested litigation such as this,[5] and certainly no imputation of bias on the part of the trial court can be drawn from them.

Nor does it justify disqualification of the presiding judge that plaintiff and counterdefendants have lost various motions filed. Commercial Carriers believe that, in the main, the motions were wholly without merit and against clear governing authority. Indeed, with respect to one such motion, counsel cited and relied upon an overruled case.[6] The motion record simply reflects plaintiff and counterdefendants' refusal to accept this governing law and to conduct pretrial and discovery proceedings in accordance with it.

## IV

## CONCLUSION

A motion to disqualify is addressed to the sound discretion of the court. Commercial Carriers, however, seriously questions whether the present motion even approaches the statutory basis for disqualification. Lacking such statutory basis, plaintiff's motion rather obviously is merely an effort to shop for what plaintiff hopes will be a sympathetic judge. Congress has specifically admonished that motions to disqualify should not be used for such purpose. We submit the motion should be forthwith denied.

Dated: November 11, 1975.

> McCUTCHEN, DOYLE, BROWN & ENERSEN
> William W. Schwarzer
> James L. Hunt
> Lynn H. Pasahow
>
> By (s)  James L. Hunt
> James L. Hunt
> Attorneys for Defendant
> Commercial Carriers, Inc.

5. Indeed, Mr. Young, attorney for plaintiff and counterdefendants, has made almost identical statements himself. For example, during the deposition of William F. Sand, he commented:
"MR. YOUNG: If I am going to be harassed this way, I might as well go down and get an order from the Judge and recess the deposition and stop this harassment by you." Transcript at 106.

6. See Commercial Carriers, Inc's Memorandum of Points and Authorities in Opposition to Motions to Dismiss, to Strike, and For a More Definite Statement, p. 12, filed December 9, 1974.

## AFFIDAVIT OF ROBERT G. FURSE RE PLAINTIFF'S MOTION TO DISQUALIFY JUDGE HAUK

### AFFIDAVIT

STATE OF TEXAS  
COUNTY OF HARRIS } ss.

Affiant, R. G. Furse, being duly sworn, deposes and says that he is a Vice President of Texas Gas Exploration Corporation ("Exploration"), a Louisiana corporation, and a division of Texas Gas Transmission Corporation ("Transmission"); that Exploration and Transmission were participants in certain joint ventures formed by Mobil Oil Company, Union Oil Company of California, Amoco Production Company, and Northwestern Mutual Life Insurance Company to submit joint bids on oil and gas leases covering certain offshore acreage in the federal domain adjacent to the states of Louisiana and Texas offered for sale to the highest bidder by the United States Department of the Interior at public sales held in 1973 and 1974; that the attached Exhibit A is a true and correct summary of the amount of acreage acquired by the joint ventures, the respective division of ownership of working interest in the leases acquired by the joint ventures and the total amount of money extended for the acquisition, exploration and development of the said federal leases to date.

(s) R. G. Furse  
R. G. Furse

SUBSCRIBED AND SWORN TO, before me, this the 12th day November, 1975.

(s) Lynda Hughes  
Notary Public in and for  
Harris County, Texas

EXHIBIT A

BLOCK 237 - OCS-G-2833, WEST CAMERON AREA - Offshore Louisiana

Acquired: December 1, 1974
Gross Acres: 5,000.00
Net Acres: 2,500.00
Ownership of Working Interest:
    Texas Gas Exploration Corporation    50%
    Union Oil Company of California    50%
Total amount expended on prospect: $7,109,473.00

BLOCK A-464, OCS-G-2364, HIGH ISLAND AREA, SOUTH ADDITION-Offshore Texas

Acquired: August 1, 1973
Gross Acres: 5,760.00
Net Acres: 639.36
Ownership of Working Interest:
    Mobil Oil Company    33-10/30%
    Union Oil Company of California    11- 3/30%
    Amoco Production Company    22- 7/30%
    Northwestern Mutual Life Insurance Co.    22- 7/30%
    Texas Gas Exploration Corporation    11- 3/30%
Total amount expended on prospect: $49,248,732.00

BLOCK A-488 - OCS-G-2371, HIGH ISLAND AREA, SOUTH ADDITION-Offshore Texas

Acquired: August 1, 1973
Gross Acres: 5,760.00
Net Acres: 2,880.00
Ownership of Working Interest:
    Texas Gas Exploration Corporation    50%
    Union Oil Company of California    50%
Total amount expended on prospect: $13,747,755.00

BLOCK A-572 - OCS-G-2392, HIGH ISLAND AREA, SOUTH ADDITION, Offshore Texas

Acquired: August 1, 1973
Gross Acres: 5,760.00
Net Acres: 639.36
Ownership of Working Interest:
    Mobil Oil Company    25%
    Union Oil Company of California    19-13/30%
    Amoco Production Company    22- 7/30%
    Northwestern Mutual Life Insurance Co.    22- 7/30%
    Texas Gas Exploration Corporation    11- 3/30%
Total amount expended on prospect: $49,400,838.00

## APPENDIX C—Continued

BLOCK A-573, OCS-G-2393, HIGH ISLAND AREA, SOUTH ADDITION, Offshore Texas

Acquired: August 1, 1973
Gross Acres: 5,760.00
Net Acres: 639.36
Ownership of Working Interest:

| | |
|---|---|
| Mobil Oil Company | 33-10/33% |
| Union Oil Company of California | 11- 3/30% |
| Amoco Production Company | 22- 7/30% |
| Northwestern Mutual Life Insurance Co. | 22- 7/30% |
| Texas Gas Exploration Corporation | 11- 3/30% |

Total amount expended on prospect: $79,790,369.00

BLOCK A-595, OCS-G-2721, HIGH ISLAND AREA, SOUTH ADDITION, Offshore Texas

Acquired: July 1, 1974
Gross Acres: 5,760.00
Net Acres: 639.35
Ownership of Working Interest:

| | |
|---|---|
| Mobil Oil Company | 33-10/30% |
| Union Oil Company of California | 11- 3/30% |
| Amoco Production Company | 22- 7/30% |
| Texas Gas Exploration Corporation | 11- 3/30% |
| Northwestern Mutual Life Insurance Co. | 22- 7/30% |

Total amount expended on prospect: $17,228,550.00

BLOCK A-596, OCS-G-2722, HIGH ISLAND AREA, SOUTH ADDITION, Offshore Texas

Acquired: July 1, 1974
Gross Acres: 5,760.00
Net Acres 639.35
Ownership of Working Interest:

| | |
|---|---|
| Mobil Oil Company | 33-10/30% |
| Union Oil Company of California | 11- 3/30% |
| Amoco Production Company | 22- 7/30% |
| Texas Gas Exploration Corporation | 11- 3/30% |
| Northwestern Mutual Life Insurance Co. | 22- 7/30% |

Total amount expended on prospect: $20,771,595.00

APPENDIX C—Continued

BLOCK A-334, OCS-G-2423, HIGH ISLAND AREA, EAST ADDITION, SOUTH EXTENSION, Offshore Texas

    Acquired:       August 1, 1973
    Gross Acres   5,760.00
    Net Acres:       639.36
    Ownership of Working Interest:

| | |
|---|---|
| Mobil Oil Company | 33-10/30% |
| Union Oil Company of California | 11- 3/30% |
| Amoco Production Company | 22- 7/30% |
| Northwestern Mutual Life Insurance Co. | 22- 7/30% |
| Texas Gas Exploration Corporation | 11- 3/30% |

    Total amount expended on prospect: $36,645,054.00

BLOCK 335, OCS-G-2738, HIGH ISLAND AREA, EAST ADDITION, SOUTH EXTENSION, Offshore Texas

    Acquired:       July 1, 1974
    Gross Acres:   5,760.00
    Net Acres:      639.36
    Ownership of Working Interest:

| | |
|---|---|
| Mobil Oil Company | 33-10/30% |
| Union Oil Company of California | 11- 3/30% |
| Amoco Production Company | 22- 7/30% |
| Northwestern Mutual Life Insurance Co. | 22- 7/30% |
| Texas Gas Exploration Corporation | 11- 3/30% |

    Total amount expended on prospect: $27,831,613.00

BLOCK A-382, OCS-G-2757, HIGH ISLAND AREA, EAST ADDITION, SOUTH EXTENSION, Offshore Texas

    Acquired:       July 1, 1974
    Gross Acres:   5,760.00
    Net Acres:      639.36
    Ownership of Working Interest:

| | |
|---|---|
| Mobil Oil Company | 29.924% |
| Union Oil Company of California | 14.510% |
| Amoco Production Company | 22.233% |
| Northwestern Mutual Life Insurance Co. | 22.233% |
| Texas Gas Exploration Corporation | 11.100% |

    Total amount expended on prospect: $5,492,766.00

**116**

## AFFIDAVIT OF JAMES L. HUNT

STATE OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO 

} ss.

JAMES L. HUNT, being first duly sworn, deposes and says:

1. My name is James L. Hunt and I am an attorney at law, licensed to practice law in the State of California and before this Court and am one of the attorneys for defendant Commercial Carriers, Inc. This affidavit is made in opposition to plaintiff's motion to disqualify Judge A. Andrew Hauk.

2. I received in my office on October 30, 1975, plaintiff's counsel's letter dated October 28, 1975, requesting information with respect to certain of the business affairs and transactions of Texas Gas Transmission Corporation, a non-party to this action.

3. I immediately forwarded this letter by United States mails to E. Phillips Malone, Esq., staff attorney for Texas Gas Transmission Corporation in Owensboro, Kentucky. I requested Mr. Malone to review the letter, and to determine what information responsive to the letter could be obtained and in what manner it could be produced for inspection by the Court.

4. Since that date, I have spoken to Mr. Malone on at least three occasions as he has endeavored to gather the requested information. He has disclosed to me that this has been a somewhat difficult task in view of the fact that it has involved inquiries not only to Texas Gas Transmission Corporation employees, but also to employees of other subsidiaries. Furthermore, there has existed the question as to whether certain of the information being gathered is competitively sensitive and thus, whether it should be submitted to the court for *in camera* review.

5. I am informed now by Mr. Malone that one or more affidavits concerning this information are now in the mails on their way to me.

6. In the course of his investigation Mr. Malone has found that Texas Gas Transmission Corporation purchases certain of its gas requirements from Union Oil, but that these purchases amount to a rather small percentage of its overall volume. Information with respect to these purchases will be provided.

7. Mr. Malone has also discovered that, although Texas Gas Transmission Corporation is not presently involved in any joint ventures or partnerships with Union Oil, that one of its subsidiaries, Texas Gas Exploration Corporation, of Houston, Texas, is involved in a consortium of four other companies, including Union Oil, in bidding for offshore oil leases with the United States Government. Data with respect to this matter will also be provided.

\* \* \* \* \* \* \* \* \* \*

8. To the extent that plaintiff's motion to disqualify implies, or, by innuendo, suggests, that counsel for Commercial Carriers, Inc. has

engaged in any improper conduct with respect to Court, I wish here to assert and testify that at no time throughout this litigation or in any other litigation, have I or, to my knowledge, my associates or partners, made any *ex parte* contacts on the Court. All meetings with the Court have been in the courtroom and on the record.

Dated: November 12, 1975.

(s) James L. Hunt
JAMES L. HUNT

SUBSCRIBED and SWORN to before me this 12th day of November, 1975.

(s) Barbara P. Melquist
Notary Public

My Commission Expires:
July 21, 1979

## ACKNOWLEDGEMENT OF SERVICE

I hereby acknowledge that a copy of the attached document was personally served upon me at the offices of Young & Young, 606 South Olive, Suite 2104, Los Angeles, California, on November 12, 1975 at 3:15 P.M.

(s) Walter H. Young
For Plaintiff and Counter-defendants, Paul A. Mavis, Robertson Truck-A-Ways, Inc., and Louis Adkins

## AFFIDAVIT OF EDWARD T. BOWERS RE PLAINTIFF'S MOTION TO DISQUALIFY JUDGE HAUK

### AFFIDAVIT

STATE OF KENTUCKY ⎱
                     ⎰ ss.
COUNTY OF DAVIESS ⎰

Affiant, Edward T. Bowers, being duly sworn, deposes and says that he is the Comptroller of Texas Gas Transmission Corporation, a Delaware corporation ("Texas Gas"); that during the twelve months ending September 30, 1975, $35,538,638 was paid to Union Oil as a producer and an operator for natural gas delivered to Texas Gas which amounted to 14.08% of the total cost of all natural gas purchased during the same period from all producers and operators delivering natural gas to Texas Gas.

(s) Edw T. Bowers

Subscribed and sworn to before me by Edward T. Bowers, this 11th day of November, 1975.

(s) Vicki C. Bowers
Notary Public
Kentucky State at Large

My commission expires: 2–15–79

118

## CERTIFICATE OF SERVICE BY MAIL

I am a citizen of the United States and am employed in the City and County of San Francisco; I am over the age of eighteen years and not a party to the within above-entitled action; my business address is 601 California Street, San Francisco, California 94108. On the 14th day of November, 1975, I served the document to which this certificate is attached on the following named person, by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States mail at San Francisco, addressed as follows:

> Walter H. Young, Esq.
> Young & Young
> 606 South Olive Street
> Suite 2104
> Los Angeles, California 90014

I certify under penalty of perjury that the foregoing is true and correct.

Executed on November 14, 1975, at San Francisco, California.

(s) Patricia Peake

Patricia Peake

SUBSCRIBED and SWORN to before me this 14th day of November, 1975.

(s) Helen Railsback
      Notary Public

My Commission Expires:

      1–21–76